**MODIFIED August 16, 2019**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2019

Lyle W. Cayce
Clerk

No. 18-11479

————

CHAD EVERET BRACKEEN; JENNIFER KAY BRACKEEN; STATE OF
TEXAS; ALTAGRACIA SOCORRO HERNANDEZ; STATE OF INDIANA;
JASON CLIFFORD; FRANK NICHOLAS LIBRETTI; STATE OF
LOUISIANA; HEATHER LYNN LIBRETTI; DANIELLE CLIFFORD,

      Plaintiffs - Appellees

v.

DAVID BERNHARDT, SECRETARY, U.S. DEPARTMENT OF THE
INTERIOR;  TARA SWEENEY, in her official capacity as Acting Assistant
Secretary for Indian Affairs; BUREAU OF INDIAN AFFAIRS; UNITED
STATES DEPARTMENT OF INTERIOR; UNITED STATES OF AMERICA;
ALEX AZAR, In his official capacity as Secretary of the United States
Department of Health and Human Services; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,

      Defendants - Appellants

CHEROKEE NATION; ONEIDA NATION; QUINAULT INDIAN NATION;
MORONGO BAND OF MISSION INDIANS,

      Intervenor Defendants - Appellants

————

Appeals from the United States District Court
for the Northern District of Texas

————

Before WIENER, DENNIS, and OWEN, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

This case presents facial constitutional challenges to the Indian Child Welfare Act of 1978 (ICWA) and statutory and constitutional challenges to the 2016 administrative rule (the Final Rule) that was promulgated by the Department of the Interior to clarify provisions of ICWA. Plaintiffs are the states of Texas, Indiana, and Louisiana, and seven individuals seeking to adopt Indian children. Defendants are the United States of America, several federal agencies and officials in their official capacities, and five intervening Indian tribes. Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, but the district court denied the motion, concluding, as relevant to this appeal, that Plaintiffs had Article III standing. The district court then granted summary judgment in favor of Plaintiffs, ruling that provisions of ICWA and the Final Rule violated equal protection, the Tenth Amendment, the nondelegation doctrine, and the Administrative Procedure Act. Defendants appealed. Although we AFFIRM the district court's ruling that Plaintiffs had standing, we REVERSE the district court's grant of summary judgment to Plaintiffs and RENDER judgment in favor of Defendants.

## BACKGROUND

### I. The Indian Child Welfare Act (ICWA)

Congress enacted the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901 *et seq.*, to address rising concerns over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band Choctaw Indians v. Holyfield*, 490

U.S. 30, 32 (1989). Recognizing that a "special relationship" exists between the United States and Indian tribes, Congress made the following findings:

Congress has plenary power over Indian affairs. 25 U.S.C. § 1901(1) (citing U.S. CONST. art. I, section 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes.")).

"[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ." *Id.* at § 1901(3).

"[A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." *Id.* at § 1901(4).

"States exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id.* at § 1901(5).

In light of these findings, Congress declared that it was the policy of the United States "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." *Id.* at § 1902.

ICWA applies in state court child custody proceedings involving an "Indian child," defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership

3

in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* at § 1903(4). In proceedings for the foster care placement or termination of parental rights, ICWA provides "the Indian custodian of the child and the Indian child's tribe [] a right to intervene at any point in the proceeding." *Id.* at § 1911(c). Where such proceedings are involuntary, ICWA requires that the parent, the Indian custodian, the child's tribe, or the Secretary of the United States Department of the Interior (Secretary or Secretary of the Interior) be notified of pending proceedings and of their right to intervene. *Id.* at § 1912. In voluntary proceedings for the termination of parental rights or adoptive placement of an Indian child, the parent can withdraw consent for any reason prior to entry of a final decree of adoption or termination, and the child must be returned to the parent. *Id.* at § 1913(c). If consent was obtained through fraud or duress, a parent may petition to withdraw consent within two years after the final decree of adoption and, upon a showing of fraud or duress, the court must vacate the decree and return the child to the parent. *Id.* at § 1913(d). An Indian child, a parent or Indian custodian from whose custody the child was removed, or the child's tribe may file a petition in any court of competent jurisdiction to invalidate an action in state court for foster care placement or termination of parental rights if the action violated any provision of ICWA §§ 1911–13. *Id.* at § 1914.

ICWA further sets forth placement preferences for foster care, preadoptive, and adoptive proceedings involving Indian children. Section 1915 requires that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with: (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." *Id.* at § 1915(a). Similar requirements are set for foster care or preadoptive placements. *Id.* at § 1915(b). If a tribe establishes by resolution a different order of preferences,

4

the state court or agency effecting the placement "shall follow [the tribe's] order so long as the placement is the least restrictive setting appropriate to the particular needs of the child." *Id.* at § 1915(c).

The state in which an Indian child's placement was made shall maintain records of the placement, which shall be made available at any time upon request by the Secretary or the child's tribe. *Id.* at § 1915(e). A state court entering a final decree in an adoptive placement "shall provide the Secretary with a copy of the decree or order" and information as necessary regarding "(1) the name and tribal affiliation of the child; (2) the names and addresses of the biological parents; (3) the names and addresses of the adoptive parents; and (4) the identity of any agency having files or information relating to such adoptive placement." *Id.* at § 1951(a). ICWA's severability clause provides that "[i]f any provision of this chapter or the applicability thereof is held invalid, the remaining provisions of this chapter shall not be affected thereby." *Id.* at § 1963.

## II. The Final Rule

ICWA provides that "the Secretary [of the Interior] shall promulgate such rules and regulations as may be necessary to carry out [its] provisions." 25 U.S.C. § 1952. In 1979, the Bureau of Indian Affairs (BIA) promulgated guidelines (the "1979 Guidelines") intended to assist state courts in implementing ICWA but without "binding legislative effect." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979). The 1979 Guidelines left the "primary responsibility" of interpreting certain language in ICWA "with the [state] courts that decide Indian child custody cases." *Id.* However, in June 2016, the BIA promulgated the Final Rule to "clarify the minimum Federal standards governing implementation of [ICWA]" and to ensure that it "is applied in all States consistent with the Act's express language, Congress's intent in enacting the statute, and to promote

the stability and security of Indian tribes and families." 25 C.F.R. § 23.101; Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,868 (June 14, 2016). The Final Rule explained that while the BIA "initially hoped that binding regulations would not be necessary to carry out [ICWA], a third of a century of experience has confirmed the need for more uniformity in the interpretation and application of this important Federal law." 81 Fed. Reg. at 38,782.

The Final Rule provides that states have the responsibility of determining whether a child is an "Indian child" subject to ICWA's requirements. 25 C.F.R. §§ 23.107–22; 81 Fed. Reg. at 38,778, 38,869–73. The Final Rule also sets forth notice and recordkeeping requirements for states, *see* 25 U.S.C. §§ 23.140–41; 81 Fed. Reg. at 38,778, 38,875–76, and requirements for states and individuals regarding voluntary proceedings and parental withdrawal of consent, *see* 25 C.F.R. §§ 23.124–28; 81 Fed. Reg. at 38,778, 38,873–74. The Final Rule also restates ICWA's placement preferences and clarifies when they apply and when states may depart from them. *See* 25 C.F.R. §§ 23.129–32; 81 Fed. Reg. at 38,778, 38,874–75.

### III. The Instant Action

### A. Parties

#### 1. Plaintiffs

Plaintiffs in this action are the states of Texas, Louisiana, and Indiana,[1] (collectively, the "State Plaintiffs"), and seven individual Plaintiffs—Chad and Jennifer Brackeen (the "Brackeens"), Nick and Heather Libretti (the "Librettis"), Altagracia Socorro Hernandez ("Hernandez"), and Jason and

---

[1] There are three federally recognized tribes in Texas: the Yselta del Sur Pueblo, the Kickapoo Tribe, and the Alabama-Coushatta Tribe. There are four federally recognized tribes in Louisiana: the Chitimacha Tribe, the Coushatta Tribe, the Tunica-Biloxi Tribe, and the Jena Band of Choctaw Indians. There is one federally recognized tribe in Indiana: the Pokagon Band of Potawatomi Indians.

Danielle Clifford (the "Cliffords") (collectively, "Individual Plaintiffs") (together with State Plaintiffs, "Plaintiffs").

*a. The Brackeens & A.L.M.*

At the time their initial complaint was filed in the district court, the Brackeens sought to adopt A.L.M., who falls within ICWA's definition of an "Indian Child." His biological mother is an enrolled member of the Navajo Nation and his biological father is an enrolled member of the Cherokee Nation. When A.L.M. was ten months old, Texas's Child Protective Services ("CPS") removed him from his paternal grandmother's custody and placed him in foster care with the Brackeens. Both the Navajo Nation and the Cherokee Nation were notified pursuant to ICWA and the Final Rule. A.L.M. lived with the Brackeens for more than sixteen months before they sought to adopt him with the support of his biological parents and paternal grandmother. In May 2017, a Texas court, in voluntary proceedings, terminated the parental rights of A.L.M.'s biological parents, making him eligible for adoption under Texas law. Shortly thereafter, the Navajo Nation notified the state court that it had located a potential alternative placement for A.L.M. with non-relatives in New Mexico, though this placement ultimately failed to materialize. In July 2017, the Brackeens filed an original petition for adoption, and the Cherokee Nation and Navajo Nation were notified in compliance with ICWA. The Navajo Nation and the Cherokee Nation reached an agreement whereby the Navajo Nation was designated as A.L.M.'s tribe for purposes of ICWA's application in the state proceedings. No one intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. The Brackeens entered into a settlement with the Texas state agency and A.L.M.'s guardian ad litem specifying that, because no one else sought to adopt A.L.M., ICWA's placement preferences did not apply. In January 2018, the Brackeens successfully petitioned to adopt A.L.M. The Brackeens initially alleged in their complaint that they would like to

continue to provide foster care for and possibly adopt additional children in need, but their experience adopting A.L.M. made them reluctant to provide foster care for other Indian children in the future. Since their complaint was filed, the Brackeens have sought to adopt A.L.M.'s sister, Y.R.J. in Texas state court. Y.R.J., like her brother, is an Indian Child for purposes of ICWA. The Navajo Nation contests the adoption. On February 2, 2019, the Texas court granted the Brackeens' motion to declare ICWA inapplicable as a violation of the Texas constitution, but "conscientiously refrain[ed]" from ruling on the Brackeens' claims under the United States Constitution pending our resolution of the instant appeal.

### b. The Librettis & Baby O.

The Librettis live in Nevada and sought to adopt Baby O. when she was born in March 2016. Baby O.'s biological mother, Hernandez, wished to place Baby O. for adoption at her birth, though Hernandez has continued to be a part of Baby O.'s life and she and the Librettis visit each other regularly. Baby O.'s biological father, E.R.G., descends from members of the Ysleta del sur Pueblo Tribe (the "Pueblo Tribe"), located in El Paso, Texas, and was a registered member at the time Baby O. was born. The Pueblo Tribe intervened in the Nevada custody proceedings seeking to remove Baby O. from the Librettis. Once the Librettis joined the challenge to the constitutionality of the ICWA and the Final Rule, the Pueblo Tribe indicated that it was willing settle. The Librettis agreed to a settlement with the tribe that would permit them to petition for adoption of Baby O. The Pueblo Tribe agreed not to contest the Librettis' adoption of Baby O., and on December 19, 2018, the Nevada state court issued a decree of adoption, declaring that the Librettis were Baby O.'s lawful parents. Like the Brackeens, the Librettis alleged that they intend to provide foster care for and possibly adopt additional children in need but are reluctant to foster Indian children after this experience.

*c. The Cliffords & Child P.*

The Cliffords live in Minnesota and seek to adopt Child P., whose maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe (the "White Earth Band"). Child P. is a member of the White Earth Band for purposes of ICWA's application in the Minnesota state court proceedings. Pursuant to ICWA section 1915's placement preferences, county officials removed Child P. from the Cliffords' custody and, in January 2018, placed her in the care of her maternal grandmother, whose foster license had been revoked. Child P.'s guardian ad litem supports the Cliffords' efforts to adopt her and agrees that the adoption is in Child P.'s best interest. The Cliffords and Child P. remain separated, and the Cliffords face heightened legal barriers to adopting her. On January 17, 2019, the Minnesota court denied the Cliffords' motion for adoptive placement.

## 2. Defendants

Defendants are the United States of America; the United States Department of the Interior and its Secretary Ryan Zinke, in his official capacity; the BIA and its Director Bryan Rice, in his official capacity; the BIA Principal Assistant Secretary for Indian Affairs John Tahsuda III, in his official capacity; and the Department of Health and Human Services ("HHS") and its Secretary Alex M. Azar II, in his official capacity (collectively the "Federal Defendants"). Shortly after this case was filed in the district court, the Cherokee Nation, Oneida Nation, Quinalt Indian Nation, and Morengo Band of Mission Indians (collectively, the "Tribal Defendants") moved to intervene, and the district court granted the motion. On appeal, we granted

the Navajo Nation's motion to intervene as a defendant[2] (together with Federal and Tribal Defendants, "Defendants").

## B. Procedural History

Plaintiffs filed the instant action against the Federal Defendants in October 2017, alleging that the Final Rule and certain provisions of ICWA are unconstitutional and seeking injunctive and declaratory relief. Plaintiffs argued that ICWA and the Final Rule violated equal protection and substantive due process under the Fifth Amendment and the anticommandeering doctrine that arises from the Tenth Amendment. Plaintiffs additionally sought a declaration that provisions of ICWA and the Final Rule violated the nondelegation doctrine and the Administrative Procedure Act (APA). Defendants moved to dismiss, alleging that Plaintiffs lacked standing. The district court denied the motion. All parties filed cross-motions for summary judgment. The district court granted Plaintiffs' motion for summary judgment in part, concluding that ICWA and the Final Rule violated equal protection, the Tenth Amendment, and the nondelegation doctrine, and that the challenged portions of the Final Rule were invalid under the APA.[3] Defendants appealed. A panel of this court subsequently stayed the district court's judgment pending further order of this court. In total, fourteen amicus briefs were filed in this court, including a brief in support of Plaintiffs and affirmance filed by the state of Ohio; and a brief in support of Defendants and reversal filed by the states of California, Alaska, Arizona, Colorado, Idaho,

---

[2] The Navajo Nation had previously moved to intervene twice in the district court. The first motion was for the limited purpose of seeking dismissal pursuant to Rule 19, which the district court denied. The Navajo Nation filed a second motion to intervene for purposes of appeal after the district court's summary judgment order. The district court deferred decision on the motion pending further action by this court, at which time the Navajo Nation filed the motion directly with this court.

[3] The district court denied Plaintiffs' substantive Due Process claim, from which Plaintiffs do not appeal.

Illinois, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Jersey, New Mexico, Oregon, Rhode Island, Utah, Virginia, Washington, and Wisconsin.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *See Texas v. United States*, 497 F.3d 491, 495 (5th Cir. 2007). Summary judgment is appropriate when the movant has demonstrated "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I. Article III Standing

Defendants first contend that Plaintiffs lack standing to challenge ICWA and the Final Rule. The district court denied Defendants' motion to dismiss on this basis, concluding that Individual Plaintiffs had standing to bring an equal protection claim; State Plaintiffs had standing to challenge provisions of ICWA and the Final Rule on the grounds that they violated the Tenth Amendment and the nondelegation doctrine; and all Plaintiffs had standing to bring an APA claim challenging the validity of the Final Rule.

Article III limits the power of federal courts to "Cases" and "Controversies." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing U.S. CONST. art. III, § 2). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Id.* To meet the Article III standing requirement, plaintiffs must demonstrate "(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992) (internal quotations omitted). A plaintiff seeking equitable relief

must demonstrate a likelihood of future injury in addition to past harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). This injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *See Lujan*, 504 U.S. at 560 (cleaned up). "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006). "This court reviews questions of standing *de novo*." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013).

## A. Standing to Bring Equal Protection Claim

Plaintiffs challenged ICWA sections 1915(a)–(b), 1913(d), and 1914 and Final Rule sections 23.129–32 on equal protection grounds, alleging that these provisions impose regulatory burdens on non-Indian families seeking to adopt Indian children that are not similarly imposed on Indian families who seek to adopt Indian children. The district court concluded that Individual Plaintiffs suffered and continued to suffer injuries when their efforts to adopt Indian children were burdened by ICWA and the Final Rule; that their injuries were fairly traceable to ICWA and the Final Rule because these authorities mandated state compliance; and that these injuries were redressable because if ICWA and the Final Rule were invalidated, then state courts would no longer be required to follow them. Defendants disagree, arguing that the Individual Plaintiffs cannot demonstrate an injury in fact or redressability and thus lack standing to bring an equal protection claim. For the reasons below, we conclude that the Brackeens have standing to assert an equal protection claim as to ICWA sections 1915(a)–(b) and Final Rule sections 23.129–32, but as

discussed below, not as to ICWA sections 1913–14. Accordingly, because one Plaintiff has standing, the "case-or-controversy requirement" is satisfied as to this claim, and we do not analyze whether any other Individual Plaintiff has standing to raise it.[4] *See Rumsfeld*, 547 U.S. at 53 n.2.

The district court concluded that ICWA section 1913(d), which allows a parent to petition the court to vacate a final decree of adoption on the grounds that consent was obtained through fraud or duress, left the Brackeens' adoption of A.L.M. vulnerable to collateral attack for two years. Defendants argue that section 1914,[5] and not section 1913(d), applies to the Brackeens' state court proceedings and that, in any event, an injury premised on potential future collateral attack under either provision is too speculative. We need not decide which provision applies here, as neither the Brackeens nor any of the Individual Plaintiffs havesuffered an injury under either provision. Plaintiffs do not assert that A.L.M.'s biological parents, the Navajo Nation, or any other party seeks to invalidate the Brackeens' adoption of A.L.M. under either provision. Plaintiffs' proffered injury under section 1913 or section 1914 is therefore too speculative to support standing. *See Lujan*, 504 U.S. at 560; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[T]hreatened injury must be *certainly impending* to constitute injury in fact, and [] [a]llegations of *possible* future injury are not sufficient." (cleaned up)). To the extent Plaintiffs argue that an injury arises from their attempts to avoid

---

[4] State Plaintiffs argue that they have standing to bring an equal protection challenge in *parens patriae* on behalf of their citizens. We disagree. *See South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) ("[A] State [does not] have standing as the parent of its citizens to invoke [the Fifth Amendment Due Process Clause] against the Federal Government, the ultimate parens patriae of every American citizen.").

[5] "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title." 25 U.S.C. § 1914.

collateral attack under section 1914 by complying with sections 1911–13, "costs incurred to avoid injury are insufficient to create standing" where the injury is not certainly impending. *See Clapper*, 568 U.S. at 417.

The district court also concluded that ICWA section 1915, and sections 23.129–32 of the Final Rule, which clarify section 1915, gave rise to an injury from an increased regulatory burden. We agree. Prior to the finalization of the Brackeens' adoption of A.L.M., the Navajo Nation notified the state court that it had located a potential alternative placement for A.L.M. in New Mexico. Though that alternative placement ultimately failed to materialize, the regulatory burdens ICWA section 1915 and Final Rule sections 23.129–32 imposed on the Brackeens in A.L.M.'s adoption proceedings, which were ongoing at the time the complaint was filed, are sufficient to demonstrate injury. *See Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007) (standing is assessed at the time the complaint was filed)*; Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (discussing *Lyons*, 461 U.S. at 108, and finding the injury requirement satisfied where the alleged harmful conduct was occurring when the complaint was filed).

Defendants contend that the Brackeens' challenge to section 1915 and sections 23.129–32 is moot. They argue that, because the Brackeens' adoption of A.L.M. was finalized in January 2018 and the Navajo Nation will not seek to challenge the adoption, section 1915's placement preferences no longer apply in A.L.M.'s adoption proceedings. Plaintiffs argue that section 1915's placement preferences impose on them the ongoing injury of increased regulatory burdens in their proceedings to adopt A.L.M.'s sister, Y.R.J., which the Navajo Nation currently opposes in Texas state court.

"A corollary to this case-or-controversy requirement is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). "[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969)(internal quotation marks omitted). However, mootness will not render a case non-justiciable where the dispute is one that is "capable of repetition, yet evading review." *See Murphy v. Hunt*, 455 U.S. 478, 482 (1982). "That exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (internal citations and quotations omitted). Here, the Brackeens were unable to fully litigate a challenge to section 1915 before successfully adopting A.L.M. Additionally, they have demonstrated a reasonable expectation that they will be subject to section 1915's regulatory burdens in their adoption proceedings involving A.L.M.'s sister, Y.R.J. Thus, the Brackeens' challenge to section 1915 is justiciable on the grounds that it is capable of repetition, yet evading review. *See Hunt*, 455 U.S. at 482.

Having thus found an injury with respect to ICWA section 1915 and Final Rule sections 23.129–32, we consider whether causation and redressability are met here. *See Lujan*, 504 U.S. at 590. The Brackeens' alleged injury is fairly traceable to the actions of at least some of the Federal Defendants, who bear some responsibility for the regulatory burdens imposed by ICWA and the Final Rule. *See Contender Farms, L.L.P.*, 779 F.3d at 266 (noting that causation "flow[ed] naturally from" a regulatory injury). Additionally, the Brackeens have demonstrated a likelihood that their injury will be redressed by a favorable ruling of this court. In the Brackeens' ongoing

proceedings to adopt Y.R.J., the Texas court has indicated that it will refrain from ruling on the Brackeens' federal constitutional claims pending a ruling from this court. Accordingly, Plaintiffs have standing to bring an equal protection claim challenging ICWA section 1915(a)–(b) and Final Rule sections 23.129–32. *See Lujan*, 504 U.S. at 590; *Rumsfeld*, 547 U.S. at 53 n.2.

## B. Standing to Bring Administrative Procedure Act Claim

Plaintiffs first argue that ICWA does not authorize the Secretary of the Interior to promulgate binding rules and regulations, and the Final Rule is therefore invalid under the APA. The district court ruled that State Plaintiffs had standing to bring this claim, determining that the Final Rule injured State Plaintiffs by intruding upon their interests as quasi-sovereigns to control the domestic affairs within their states.[6] A state may be entitled to "special solicitude" in our standing analysis if the state is vested by statute with a procedural right to file suit to protect an interest and the state has suffered an injury to its "quasi-sovereign interests." *Massachusetts v. EPA,* 549 U.S. 497, 518–20 (2007) (holding that the Clean Air Act provided Massachusetts a procedural right to challenge the EPA's rulemaking, and Massachusetts suffered an injury in its capacity as a quasi-sovereign landowner due to rising sea levels associated with climate change). Applying *Massachusetts*, this court in *Texas v. United States* held that Texas had standing to challenge the Department of Homeland Security's implementation and expansion of the Deferred Action for Childhood Arrivals program (DACA) under the APA. *See* 809 F.3d 134, 152 (5th Cir. 2015). This court reasoned that Texas was entitled to special solicitude on the grounds that the APA created a procedural right to

---

[6] The district court also found an injury based on the Social Security Act's conditioning of funding on states' compliance with ICWA. However, because we find that Plaintiffs have standing on other grounds, we decline to decide whether they have demonstrated standing based on an alleged injury caused by the SSA.

challenge the DHS's actions, and DHS's actions affected states' sovereign interest in creating and enforcing a legal code. *See id.* at 153 (internal quotations omitted).

Likewise, here, the APA provides State Plaintiffs a procedural right to challenge the Final Rule. *See id.*; 5 U.S.C. § 702. Moreover, State Plaintiffs allege that the Final Rule affects their sovereign interest in controlling child custody proceedings in state courts. *See Texas*, 809 F.3d at 153 (recognizing that, pursuant to a sovereign interest in creating and enforcing a legal code, states may have standing based on, inter alia, federal preemption of state law). Thus, State Plaintiffs are entitled to special solicitude in our standing inquiry. With this in mind, we find that the elements of standing are satisfied. If, as State Plaintiffs alleged, the Secretary promulgated a rule binding on states without the authority to do so, then State Plaintiffs have suffered a concrete injury to their sovereign interest in controlling child custody proceedings that was caused by the Final Rule. Additionally, though state courts and agencies are not bound by this court's precedent, a favorable ruling from this court would remedy the alleged injury to states by making their compliance with ICWA and the Final Rule optional rather than compulsory. *See Massachusetts*, 549 U.S. at 521 (finding redressability where the requested relief would prompt the agency to "reduce th[e] risk" of harm to the state).

### C. Standing to Bring Tenth Amendment Claim

For similar reasons, the district court found, and we agree, that State Plaintiffs have standing to challenge provisions of ICWA and the Final Rule under the Tenth Amendment. The imposition of regulatory burdens on State Plaintiffs is sufficient to demonstrate an injury to their sovereign interest in creating and enforcing a legal code to govern child custody proceedings in state courts. *See Texas*, 809 F.3d at 153. Additionally, the causation and redressability requirements are satisfied here, as a favorable ruling from this

court would likely redress State Plaintiffs' injury by lifting the mandatory burdens ICWA and the Final Rule impose on states. *See Lujan*, 504 U.S. at 590.

### D. Standing to Bring Nondelegation Claim

Finally, Plaintiffs contend that ICWA section 1915(c), which allows a tribe to establish a different order of section 1915(a)'s placement preferences, is an impermissible delegation of legislative power that binds State Plaintiffs. Defendants argue that State Plaintiffs cannot demonstrate an injury, given the lack of evidence that a tribe's reordering of section 1915(a)'s placement preferences has affected any children in Texas, Indiana, or Louisiana or that such impact is "certainly impending." State Plaintiffs respond that tribes can change ICWA's placement preferences at any time and that at least one tribe, the Alabama-Coushatta Tribe of Texas, has already done so. We conclude that State Plaintiffs have demonstrated injury and causation with respect to this claim, as State Plaintiffs' injury from the Alabama-Coushatta Tribe's decision to depart from ICWA section 1915's placement preferences is concrete and particularized and not speculative. *See Lujan*, 504 U.S. at 560. Moreover, a favorable ruling from this court would redress State Plaintiffs' injury by making a state's compliance with a tribe's alternative order of preferences under ICWA section 1915(c) optional rather than mandatory. *See id.*

Accordingly, having found that State Plaintiffs have standing on the aforementioned claims, we proceed to the merits of these claims. We note at the outset that ICWA is entitled to a "presumption of constitutionality," so long as Congress enacted the statute "based on one or more of its powers enumerated in the Constitution." *See United States v. Morrison*, 529 U.S. 598, 607 (2000). "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon

a plain showing that Congress has exceeded its constitutional bounds." *Id.* (citing, among others, *United States v. Harris*, 106 U.S. 629, 635 (1883)).

## II.   Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. 14, § 1.  This clause is implicitly incorporated into the Fifth Amendment's guarantee of due process. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  We apply the same analysis with respect to equal protection claims under the Fifth and Fourteenth Amendments. *See Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995).  In evaluating an equal protection claim, strict scrutiny applies to laws that rely on classifications of persons based on race. *See id.*  But where the classification is political, rational basis review applies. *See Morton v. Mancari*, 417 U.S. 535, 555 (1974).  The district court granted summary judgment on behalf of Plaintiffs, concluding that section 1903(4)—setting forth ICWA's definition of "Indian Child" for purposes of determining when ICWA applies in state child custody proceedings—was a race-based classification that could not withstand strict scrutiny.[7]  On appeal, the parties disagree as to whether section 1903(4)'s definition of "Indian Child" is a political or race-based classification and which level of scrutiny applies. "We review the constitutionality of federal statutes de novo." *Nat'l Rifle Ass'n*

---

[7] As described above, we conclude that Plaintiffs have standing to challenge ICWA section 1915(a)–(b) and Final Rule sections 23.129–32 on equal protection grounds.  The district court's analysis of whether the ICWA classification was political or race-based focused on ICWA section 1903(4), presumably because section 1903(4) provides a threshold definition of "Indian child" that must be met for any provision of ICWA to apply in child custody proceedings in state court.  Because we are satisfied that our analysis would produce the same result with respect to section 1903(4) and the specific provisions Plaintiffs have standing to challenge, we similarly confine our discussion of whether ICWA presents a political or race-based classification to section 1903(4).

*of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012).

## A. Level of Scrutiny

We begin by determining whether ICWA's definition of "Indian child" is a race-based or political classification and, consequently, which level of scrutiny applies. The district court concluded that ICWA's "Indian Child" definition was a race-based classification. We conclude that this was error. Congress has exercised plenary power "over the tribal relations of the Indians . . . from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903). The Supreme Court's decisions "leave no doubt that federal legislation with respect to Indian tribes . . . is not based upon impermissible racial classifications." *United States v. Antelope*, 430 U.S. 641, 645 (1977). "Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations." *Mancari*, 417 U.S. at 552. "If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." *Id.*

In *Morton v. Mancari*, the Supreme Court rejected a challenge to a law affording to qualified Indian applicants—those having one-fourth or more degree Indian blood with membership in a federally recognized tribe[8]—a hiring

---

[8] The United States currently recognizes 573 Tribal entities. *See* 84 Fed. Reg. 1,200 (Feb. 1, 2019). Federal recognition "is a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government." *See California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (quoting COHEN'S HANDBOOK OF

preference over non-Indians within the BIA. *Id.* at 555. The Court recognized that central to the resolution of the issue was "the unique legal status of Indian tribes under federal law and upon the plenary power of Congress . . . to legislate on behalf of federally recognized Indian tribes." *Id.* at 551. It reasoned that the BIA's hiring preference was "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* at 554. The preference was thus a non-racial "employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups. It [was] directed to participation by the governed in the governing agency." *Id.* at 553–54. The disadvantages to non-Indians resulting from the hiring preferences were an intentional and "desirable feature of the entire program for self-government."[9] *Id.* at 544.

---

FEDERAL INDIAN LAW § 3.02[3], at 138 (2005 ed.) (internal quotation marks omitted)). It "[i]s a prerequisite to the protection, services, and benefits of the Federal Government available to those that qualify." 25 C.F.R. § 83.2.

[9] Plaintiffs argue that, unlike the law in *Mancari*, ICWA is not a law promoting tribal self-governance. However, prior to enacting ICWA, Congress considered testimony from the Tribal Chief of the Mississippi Band of Choctaw Indians about the devastating impacts of removing Indian children from tribes and placing them for adoption and foster care in non-Indian homes:

> Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships.

*Holyfield*, 490 U.S. at 34. This testimony undoubtedly informed Congress's finding that children are the most vital resource "to the continued existence and integrity of Indian tribes." 25 U.S.C. § 1901(3). Thus, interpreting ICWA as related to tribal self-government and the survival of tribes makes the most sense in light of Congress's explicit intent in enacting the statute. *See id.*

The district court construed *Mancari* narrowly and distinguished it for two primary reasons: First, the district court found that the law in *Mancari* provided special treatment "only to Indians living on or near reservations." Second, the district court concluded that ICWA's membership eligibility standard for an Indian child does not rely on actual tribal membership as did the statute in *Mancari*. The district court reasoned that, whereas the law in *Mancari* "applied 'only to *members* of 'federally recognized' tribes which operated to exclude many individuals who are racially to be classified as Indians,'" ICWA's definition of "Indian child" extended protection to children who were *eligible* for membership in a federally recognized tribe and had a biological parent who was a member of a tribe. The district court, citing the tribal membership laws of several tribes, including the Navajo Nation, concluded that "[t]his means one is an Indian child if the child is related to a tribal ancestor by blood."

We disagree with the district court's reasoning and conclude that *Mancari* controls here. As to the district court's first distinction, *Mancari*'s holding does not rise or fall with the geographical location of the Indians receiving "special treatment." *See Mancari*, 417 U.S. at 552. The Supreme Court has long recognized Congress's broad power to regulate Indians and Indian tribes on and off the reservation. *See e.g., United States v. McGowan*, 302 U.S. 535, 539 (1938) ("Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States."); *Perrin v. United States*, 232 U.S. 478, 482 (1914) (acknowledging Congress's power to regulate Indians "whether upon or off a reservation and whether within or without the limits of a state").

Second, the district court concluded that, unlike the statute in *Mancari*, ICWA's definition of Indian child extends to children who are merely eligible for tribal membership because of their ancestry. However, ICWA's definition

of "Indian child" is not based solely on tribal ancestry or race. ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). As Defendants explain, under some tribal membership laws, eligibility extends to children without Indian blood, such as the descendants of former slaves of tribes who became members after they were freed, or the descendants of adopted white persons. Accordingly, a child may fall under ICWA's membership eligibility standard because his or her biological parent became a member of a tribe, despite not being racially Indian. Additionally, many racially Indian children, such as those belonging to non-federally recognized tribes, do not fall within ICWA's definition of "Indian child." Conditioning a child's eligibility for membership, in part, on whether a biological parent is a member of the tribe is therefore not a proxy for race, as the district court concluded, but rather for not-yet-formalized tribal affiliation, particularly where the child is too young to formally apply for membership in a tribe.[10]

Our conclusion that ICWA's definition of Indian child is a political classification is consistent with both the Supreme Court's holding in *Mancari* and this court's holding in *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1212 (5th Cir. 1991). In *Mancari*, the hiring preference extended to individuals who were one-fourth or more degree Indian blood and a member of

---

[10] The Navajo Nation's membership code is instructive on these points, despite the district court's reliance on it to the contrary. The Navajo Nation explains that, under its laws, "blood alone is never determinative of membership." The Navajo Nation will only grant an application for membership "if the individual has some tangible connection to the Tribe," such as the ability to speak the Navajo language or time spent living among the Navajo people. "Having a biological parent who is an enrolled member is per se evidence of such a connection." Additionally, individuals will not be granted membership in the Navajo Nation, regardless of their race or ancestry, if they are members of another tribe.

a federally recognized tribe. *See* 417 U.S. at 554. Similarly, in *Peyote Way*, this court considered whether equal protection was violated by federal and state laws prohibiting the possession of peyote by all persons except members of the Native American Church of North America (NAC), who used peyote for religious purposes. *See* 922 F.2d at 1212. Applying *Mancari*'s reasoning, this court upheld the preference on the basis that membership in NAC "is limited to Native American members of federally recognized tribes who have at least 25% Native American ancestry, and therefore represents a political classification." *Id.* at 1216. ICWA's "Indian child" eligibility provision similarly turns, at least in part, on whether the child is eligible for membership in a federally recognized tribe. *See California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (federal recognition "is a formal political act" that "institutionaliz[es] the government-to-government relationship between the tribe and the federal government."); 25 U.S.C. § 1903(4).

The district court concluded, and Plaintiffs now argue, that ICWA's definition "mirrors the impermissible racial classification in *Rice* [*v. Cayetano*, 528 U.S. 495 (2000)], and is legally and factually distinguishable from the political classification in *Mancari*." The Supreme Court in *Rice* concluded that a provision of the Hawaiian Constitution that permitted only "Hawaiian" people to vote in the statewide election for the trustees of the Office of Hawaiian Affairs (OHA) violated the Fifteenth Amendment. 528 U.S. at 515. "Hawaiian" was defined by statute as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Id.* The Court noted the state legislature's express purpose in using ancestry as a proxy for race and held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a

free people whose institutions are founded upon the doctrine of equality." *Id.* at 514–17 (citing *Hirabayashi v. United States,* 320 U.S. 81, 100 (1943)). Distinguishing *Mancari,* the Court noted that its precedent did not afford Hawaiians a protected status like that of Indian tribes; that the OHA elections were an affair of the state and not of a "separate quasi sovereign" like a tribe; and that extending "*Mancari* to this context would [] permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." *Id.* at 522.

*Rice* is distinguishable from the present case for several reasons. Unlike *Rice,* which involved voter eligibility in a state-wide election for a state agency, there is no similar concern here that applying *Mancari* would permit "by racial classification, [the fencing] out [of] whole classes of [a state's] citizens from decisionmaking in critical state affairs." *See* 528 U.S. at 518–22. Additionally, as discussed above, ICWA's definition of "Indian child," unlike the challenged law in *Rice,* does not single out children "*solely* because of their ancestry or ethnic characteristics." *See id.* at 515 (emphasis added). Further, unlike the law in *Rice,* ICWA is a federal law enacted by Congress for the protection of Indian children and tribes. *See Rice,* 528 U.S. at 518 (noting that to sustain Hawaii's restriction under *Mancari,* it would have to "accept some beginning premises not yet established in [its] case law," such as that Congress "has determined that native Hawaiians have a status like that of Indians in organized tribes"); *see also Kahawaiolaa v. Norton,* 386 F.3d 1271, 1279 (9th Cir. 2004) (rejecting an equal protection challenge brought by Native Hawaiians, who were excluded from the U.S. Department of the Interior's regulatory tribal acknowledgement process, and concluding that the recognition of Indian tribes was political). Additionally, whereas the OHA elections in *Rice* were squarely state affairs, state court adoption proceedings involving Indian children are simultaneously affairs of states, tribes, and

25

Congress. *See* 25 U.S.C. § 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."). Because we find *Rice* inapplicable, and *Mancari* controlling here, we conclude, contrary to the district court's determination, that ICWA's definition of "Indian child" is a political classification subject to rational basis review. *See Mancari*, 417 U.S. at 555.

## B. Rational Basis Review

Having so determined that rational basis review applies, we ask whether "the special treatment can be tied rationally to the fulfillment of Congress's unique obligation toward the Indians." *Mancari*, 417 U.S. at 555. Given Congress's explicit findings and stated objectives in enacting ICWA, we conclude that the special treatment ICWA affords Indian children is rationally tied to Congress's fulfillment of its unique obligation toward Indian nations and its stated purpose of "protect[ing] the best interests of Indian children and [] promot[ing] the stability and security of Indian tribes." *See* 25 U.S.C. §§ 1901–02; *see also Mancari*, 417 U.S. at 555. ICWA section 1903(4)'s definition of an "Indian child" is a political classification that does not violate equal protection.

## III. Tenth Amendment

The district court concluded that ICWA sections 1901–23[11] and 1951–52[12] violated the anticommandeering doctrine by requiring state courts and executive agencies to apply federal standards to state-created claims. The

---

[11] ICWA sections 1901–03 set forth Congress's findings, declaration of policy, and definitions. Sections 1911–23 govern child custody proceedings, including tribal court jurisdiction, notice requirements in involuntary and voluntary state proceedings, termination of parental rights, invalidation of state proceedings, placement preferences, and agreements between states and tribes.

[12] Section 1951 sets forth information-sharing requirements for state courts. Section 1952 authorizes the Secretary of the Interior to promulgate necessary rules and regulations.

district court also considered whether ICWA preempts conflicting state law under the Supremacy Clause and concluded that preemption did not apply because the law "*directly* regulated states." Defendants argue that the anticommandeering doctrine does not prevent Congress from requiring state courts to enforce substantive and procedural standards and precepts, and that ICWA sets minimum procedural standards that preempt conflicting state law. We examine the constitutionality of the challenged provisions of ICWA below and conclude that they preempt conflicting state law and do not violate the anticommandeering doctrine. .

## A. Anticommandeering Doctrine

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. Congress's legislative powers are limited to those enumerated under the Constitution. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* The anticommandeering doctrine, an expression of this limitation on Congress, prohibits federal laws commanding the executive or legislative branch of a state government to act or refrain from acting.[13] *Id.* at 1478 (holding that a federal law prohibiting state authorization of sports gambling violated the anticommandeering rule by "unequivocally dictat[ing] what a state legislature

---

[13] Though Congress is prohibited from commandeering states, it can "encourage a State to regulate in a particular way, or . . . hold out incentives to the States as a method of influencing a State's policy choices." *New York*, 505 U.S. at 166. For example, Congress may also condition the receipt of federal funds under its spending power. *See id.* at 167. Defendants also contend that ICWA is authorized under Congress's Spending Clause powers because Congress conditioned federal funding in Title IV-B and E of the Social Security Act on states' compliance with ICWA. However, because we conclude that ICWA is constitutionally permissible on other bases, we need not reach this argument.

may and may not do"); *Printz v. United States*, 521 U.S. 898, 935 (1997) (holding that a federal law requiring state chief law enforcement officers to conduct background checks on handgun purchasers "conscript[ed] the State's officers directly" and was invalid); *New York v. United States*, 505 U.S. 144, 175–76 (1992) (holding that a federal law impermissibly commandeered states to implement federal legislation when it gave states "[a] choice between two unconstitutionally coercive" alternatives: to either dispose of radioactive waste within their boundaries according to Congress's instructions or "take title" to and assume liabilities for the waste).

## 1. State Courts

Defendants argue that because the Supremacy Clause requires the enforcement of ICWA and the Final Rule by state courts, these provisions do not run afoul of the anticommandeering doctrine. We agree. The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. In setting forth the anticommandeering doctrine, the Supreme Court drew a distinction between a state's courts and its political branches. The Court acknowledged that "[f]ederal statutes enforceable in state court do, in a sense, direct state judges to enforce them, but this sort of federal "direction" of state judges is mandated by the text of the Supremacy Clause." *New York*, 505 U.S. at 178–79 (internal quotation marks omitted). Early laws passed by the first Congresses requiring state court action "establish, at most, that the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions, insofar as those prescriptions related to matters appropriate for the judicial power." *Printz*, 521 U.S. at 907. State courts were viewed as distinctive because, "unlike [state] legislatures and executives, they

applied the law of other sovereigns all the time," including as mandated by the Supremacy Clause. *Id.* Thus, to the extent provisions of ICWA and the Final Rule require state courts to enforce federal law, the anticommandeering doctrine does not apply. *See id.* at 928–29 (citing *Testa v. Katt*, 330 U.S. 386 (1947), "for the proposition that state courts cannot refuse to apply federal lawa conclusion mandated by the terms of the Supremacy Clause").

## 2. State Agencies

Plaintiffs next challenge several provisions of ICWA that they contend commandeer state executive agencies, including sections 1912(a) (imposing notice requirements on "the party seeking the foster care placement of, or termination of parental rights to, an Indian child"), 1912(d) (requiring that "any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."), 1915(c) (requiring "the agency or court effecting [a] placement" adhere to the order of placement preferences established by the tribe), and 1915(e) (requiring that "the State" in which the placement was made keep a record of each placement, evidencing the efforts to comply with the order of preference, to be made available upon request of the Secretary or the child's tribe). *See* 25 U.S.C. §§ 1912, 1915. Plaintiffs argue that ICWA's requirements on state agencies go further than the federal regulatory scheme invalidated in *Printz* and impermissibly impose costs that states must bear. Defendants contend that the challenged provisions of ICWA apply to private parties and state agencies alike and therefore do not violate the anticommandeering doctrine.

In *Printz*, the Supreme Court affirmed its prior holding that "[t]he Federal Government may not compel the States to enact or administer a

federal regulatory program," and "Congress cannot circumvent that prohibition by conscripting the State's officers directly." 521 U.S. at 925, 935 (quoting *New York,* 505 U.S. at 188). The *Printz* Court, rejecting as irrelevant the Government's argument that the federal law imposed a minimal burden on state executive officers, explained that it was not "evaluating whether the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of state governments," but rather a law whose "whole *object* . . . [was] to direct the functioning of the state executive." *Id.* at 931–32. Expanding upon this distinction, the Court in *Murphy* discussed *Reno v. Condon*, 528 U.S. 141 (2000), and *South Carolina v. Baker*, 485 U.S. 505 (1988), and held that "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." 138 S. Ct. at 1478.

In *Condon*, the Court upheld a federal regulatory scheme that restricted the ability of states to disclose a driver's personal information without consent. 528 U.S. at 151. In determining that the anticommandeering doctrine did not apply, the Court distinguished the law from those invalidated in *New York* and *Printz*:

> [This law] does not require the States in their sovereign capacity to regulate their own citizens. The [law] regulates the States as the owners of [Department of Motor Vehicle] data bases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals.

*Id.* In *Baker*, the Court rejected a Tenth Amendment challenge to a provision of a federal statute that eliminated the federal income tax exemption for interest earned on certain bonds issued by state and local governments unless the bonds were registered, treating the provision "as if it directly regulated States by prohibiting outright the issuance of [unregistered] bearer bonds." 485 U.S. at 507–08, 511. The Court reasoned that the provision at issue merely

"regulat[ed] a state activity" and did not "seek to control or influence the manner in which States regulate private parties." *Id.* at 514. "That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Id.* at 514–15. "[S]ubstantial effort[s]" to comply with federal regulations are "an inevitable consequence of regulating a state activity." *Id.* at 514.

In light of these cases, we conclude that the provisions of ICWA that Plaintiffs challenge do not commandeer state agencies. Sections 1912(a) and (d) impose notice and "active efforts" requirements on the "party" seeking the foster care placement of, or termination of parental rights to, an Indian child. Because both state agencies and private parties who engage in state child custody proceedings may fall under these provisions, 1912(a) and (d) "evenhandedly regulate[] an activity in which both States and private actors engage."[14] *See Murphy*, 138 S. Ct. at 1478. Moreover, sections 1915(c) and (e) impose an obligation on "the agency or court effecting the placement" of an Indian child to respect a tribe's order of placement preferences and require that "the State" maintain a record of each placement to be made available to the Secretary or child's tribe. These provisions regulate state activity and do not

---

[14] Similarly, section 1912(e) provides that no foster care placement may be ordered in involuntary proceedings in state court absent "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *See* 25 U.S.C. § 1912(e). Section 1912(f) requires that no termination of parental rights may be ordered in involuntary proceedings in state court absent evidence beyond a reasonable doubt of the same. *See id.* at 1912(f). Neither section expressly refers to state agencies and, in conjunction with section 1912(d), both sections must be reasonably read to refer to "any party" seeking the foster care placement of, or the termination of parental rights to, an Indian child. Thus, like section 1912(d), sections 1912(e)–(f) "evenhandedly regulate[] an activity in which both States and private actors engage" and do not run afoul of the anticommandeering doctrine. *See Murphy*, 138 S. Ct. at 1478; *see also Condon*, 528 U.S. at 151.

require states to enact any laws or regulations, or to assist in the enforcement of federal statutes regulating private individuals. *See Condon*, 528 U.S. at 151; *Baker*, 485 U.S. at 514; *see also Printz*, 521 U.S. at 918 (distinguishing statutes that merely require states to provide information to the federal government from those that command state executive agencies to actually administer federal programs). To the contrary, they merely require states to "take administrative . . . action to comply with federal standards regulating" child custody proceedings involving Indian children, which is permissible under the Tenth Amendment.[15] *See Baker*, 485 U.S. at 514–15.

## B. Preemption

Defendants argue that, to the extent there is a conflict between ICWA and applicable state laws in child custody proceedings, ICWA preempts state law. The Supremacy Clause provides that federal law is the "supreme Law of

---

[15] In ruling otherwise, the district court discussed *Murphy* and emphasized that adhering to the anticommandeering rule is necessary to protect constitutional principles of state sovereignty, promote political accountability, and prevent Congress from shifting the costs of regulation to states. *See Murphy*, 138 S. Ct. at 1477. These principles do not compel the result reached by the district court. *See id.* First, the anticommandeering doctrine is not necessary here to protect constitutional principles of state sovereignty because ICWA regulates the actions of state executive agencies in their role as child advocates and custodians, and not in their capacity as sovereigns enforcing ICWA. *See id.* at 1478; *see also Condon*, 528 U.S. at 151 (concluding that the law in question there "does not require the States in their sovereign capacity to regulate their own citizens [but] regulates the States as the owners of data bases"). The need to promote political accountability is minimized here for similar reasons, as ICWA does not require states to regulate their own citizens. *See Murphy*, 138 S. Ct. at 1477 (noting concern that, if states are required to impose a federal regulation on their voters, the voters will not know who to credit or blame and responsibility will be "blurred"). Finally, the need to prevent Congress from shifting the costs of regulation to states is also minimized here, where some of the requirements at issue, like those in sections 1912(d) and 1915(c), simply regulate a state's actions during proceedings that it would already be expending resources on. ICWA's recordkeeping and notice requirements could impose costs on states, but we cannot conclude that these costs compel application of the anticommandeering doctrine. *See Condon*, 528 U.S. at 150 (a federal law that "require[d] time and effort on the part of state employees" was constitutional); *Baker*, 485 U.S. at 515 (that states may have to raise funds necessary to comply with federal regulations "presents no constitutional defect").

the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Conflict preemption occurs when "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 138 S. Ct. at 1480. For a federal law to preempt conflicting state law, two requirements must be satisfied: The challenged provision of the federal law "must represent the exercise of a power conferred on Congress by the Constitution" and "must be best read as one that regulates private actors" by imposing restrictions or conferring rights. *Id.* at 1479–80. The district court concluded that preemption does not apply here, as ICWA regulates states rather than private actors. We review de novo whether a federal law preempts a state statute or common law cause of action. *See Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

Congress enacted ICWA to "establish[] minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. Defendants contend that these minimum federal standards preempt conflicting state laws. Plaintiffs contend that preemption does not apply here because ICWA regulates states and not individuals, and nothing in the Constitution gives Congress authority to regulate the adoption of Indian children under state jurisdiction.

ICWA specifies that Congress's authority to regulate the adoption of Indian children arises under the Indian Commerce Clause as well as "other constitutional authority." 25 U.S.C. § 1901(1). The Indian Commerce Clause provides that "[t]he Congress shall have Power To . . . regulate Commerce . . . with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has repeatedly held that the Indian Commerce Clause grants Congress plenary

power over Indian affairs. *See Lara*, 541 U.S. at 200 (noting that the Indian Commerce and Treaty Clauses are sources of Congress's "plenary and exclusive" "powers to legislate in respect to Indian tribes"); *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 837 (1982) (discussing Congress's "broad power . . . to regulate tribal affairs under the Indian Commerce Clause"); *Mancari*, 417 U.S. at 551–52 (noting that "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from," inter alia, the Indian Commerce Clause). Plaintiffs do not provide authority to support a departure from that principle here.

Moreover, ICWA clearly regulates private individuals. *See Murphy*, 138 S. Ct. at 1479–80. In enacting the statute, Congress declared that it was the dual policy of the United States to protect the best interests of Indian children and promote the stability and security of Indian families and tribes. 25 U.S.C. § 1902. Each of the challenged provisions applies within the context of state court proceedings involving Indian children and is informed by and designed to promote Congress's goals by conferring rights upon Indian children and families.[16] *See* H.R. REP. No. 95-1386, at 18 (1978) ("We conclude that rights arising under [ICWA] may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local law, is adequate to the occasion."

---

[16] Arguably, two of the challenged provisions of ICWA could be construed to simultaneously "confer[] rights" on Indian children and families while "imposing restrictions" on state agencies. *See Murphy*, 138 S. Ct. at 1479–80. Section 1915(c) requires "the agency or court effecting [a] placement" to adhere to a tribe's established order of placement preferences, and section 1915(e) requires states to keep records and make them available to the Secretary and Indian tribes. 25 U.S.C. § 1915(c), (e). However, *Murphy* instructs that for a provision of a federal statute to preempt state law, the provision must be "*best read* as one that regulates private actors." *See* 138 S. Ct. at 1479 (emphasis added). In light of Congress's express purpose in enacting ICWA, the legislative history of the statute, and section 1915's scope in setting forth minimum standards for the "Placement of Indian children," we conclude that these provisions are "best read" as regulating private actors by conferring rights on Indian children and families. *See id.*

(quoting *Second Employers' Liability Cases*, 223 U.S. 1, 59 (1912))). Thus, to the extent ICWA's minimum federal standards conflict with state law, "federal law takes precedence and the state law is preempted." *See Murphy*, 138 S. Ct. at 1480.

## IV. Nondelegation Doctrine

Article I of the Constitution vests "[a]ll legislative Powers" in Congress. U.S. CONST. art. 1, § 1, cl. 1. "In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). The limitations on Congress's ability to delegate its legislative power are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *See United States v. Mazurie*, 419 U.S. 544, 556–57 (1975). ICWA section 1915(c) allows Indian tribes to establish through tribal resolution a different order of preferred placement than that set forth in sections 1915(a) and (b).[17] Section 23.130 of the Final Rule provides that a tribe's established placement preferences apply over those specified in ICWA.[18] The district court determined that these provisions violated the nondelegation doctrine, reasoning that section 1915(c) grants Indian tribes the power to change legislative preferences with binding effect on the states, and Indian tribes, like private entities, are not part of the federal government of the United States and cannot exercise federal legislative or executive regulatory power over non-Indians on non-tribal lands.

---

[17] The section provides: "In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section." 25 U.S.C. § 1915(c).

[18] "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply." 25 C.F.R. § 23.130.

Defendants argue that the district court's analysis of the constitutionality of these provisions ignores the inherent sovereign authority of tribes. They contend that section 1915 merely recognizes and incorporates a tribe's exercise of its inherent sovereignty over Indian children and therefore does not—indeed cannot—delegate this existing authority to Indian tribes.

The Supreme Court has long recognized that Congress may incorporate the laws of another sovereign into federal law without violating the nondelegation doctrine. *See Mazurie*, 419 U.S. at 557 ("[I]ndependent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of its own authority 'to regulate Commerce . . . with the Indian tribes.'"); *United States v. Sharpnack*, 355 U.S. 286, 293–94 (1958) (holding that a statute that prospectively incorporated state criminal laws "in force at the time" of the alleged crime was a "deliberate continuing adoption by Congress" of state law as binding federal law in federal enclaves within state boundaries); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 80 (1824) ("Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject."). "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Mazurie*, 419 U.S. at 557. Though some exercises of tribal power require "express congressional delegation," the "tribes retain their inherent power to determine tribal membership [and] to regulate domestic relations among members . . . ." *See Montana v. United States*, 450 U.S. 544, 564 (1981); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 170 (1982) ("tribes retain the power to create substantive law governing internal tribal affairs" like tribal citizenship and child custody).

In *Mazurie*, a federal law allowed the tribal council of the Wind River Tribes, with the approval of the Secretary of the Interior, to adopt ordinances to control the introduction of alcoholic beverages by non-Indians on privately

owned land within the boundaries of the reservation. *See* 419 U.S. at 547, 557. The Supreme Court held that the law did not violate the nondelegation doctrine, focusing on the Tribes' inherent power to regulate their internal and social relations by controlling the distribution and use of intoxicants within the reservation's bounds. *Id.* *Mazurie* is instructive here. ICWA section 1915(c) provides that a tribe may pass, by its own legislative authority, a resolution reordering the three placement preferences set forth by Congress in section 1915(a). Pursuant to this section, a tribe may assess whether the most appropriate placement for an Indian child is with members of the child's extended family, the child's tribe, or other Indian families, and thereby exercise its "inherent power to determine tribal membership [and] regulate domestic relations among members" and Indian children eligible for membership. *See Montana*, 450 U.S. at 564.

State Plaintiffs contend that *Mazurie* is distinguishable because it involves the exercise of tribal authority on tribal lands, whereas ICWA permits the extension of tribal authority over states and persons on non-tribal lands. We find this argument unpersuasive. It is well established that tribes have "sovereignty *over both their members and their territory*." *See Mazurie*, 419 U.S. at 557 (emphasis added). For a tribe to exercise its authority to determine tribal membership and to regulate domestic relations among its members, it must necessarily be able to regulate all Indian children, irrespective of their location.[19] *See Montana*, 450 U.S. at 564 (tribes retain inherent power to regulate domestic relations and determine tribal membership); *Merrion*, 455 U.S. at 170 (tribes retain power to govern tribal citizenship and child custody). Section 1915(c), by recognizing the inherent powers of tribal sovereigns to

---

[19] Indeed, as the BIA noted in promulgating the Final Rule, at least 78% of Native Americans lived outside of Indian country as of 2016. *See* 81 Fed. Reg. at 38,778, 38,783.

determine by resolution the order of placement preferences applicable to an Indian child, is thus a "deliberate continuing adoption by Congress" of tribal law as binding federal law. *See Sharpnack*, 355 U.S. at 293–94; *see also* 25 U.S.C. § 1915(c); 81 Fed. Reg. at 38,784 (the BIA noting that "through numerous statutory provisions, ICWA helps ensure that State courts incorporate Indian social and cultural standards into decision-making that affects Indian children"). We therefore conclude that ICWA section 1915(c) is not an unconstitutional delegation of Congressional legislative power to tribes, but is an incorporation of inherent tribal authority by Congress. *See Mazurie*, 419 U.S. at 544; *Sharpnack*, 355 U.S. at 293–94.

## V. The Final Rule

The district court held that, to the extent sections 23.106–22, 23.124–32, and 23.140–41 of the Final Rule were binding on State Plaintiffs, they violated the APA for three reasons: The provisions (1) purported to implement an unconstitutional statute; (2) exceeded the scope of the Interior Department's statutory regulatory authority to enforce ICWA with binding regulations; and (3) reflected an impermissible construction of ICWA section 1915. We examine each of these bases in turn.

## A. The Constitutionality of ICWA

Because we concluded that the challenged provisions of ICWA are constitutional, for reasons discussed earlier in this opinion, the district court's first conclusion that the Final Rule was invalid because it implemented an unconstitutional statue was erroneous. Thus, the statutory basis of the Final Rule is constitutionally valid.

## B. The Scope of the BIA's Authority

Congress authorized the Secretary of the Interior to promulgate rules and regulations that may be necessary to carry out the provisions of ICWA. *See* 25 U.S.C. § 1952. Pursuant to this provision, the BIA, acting under

authority delegated by the Interior Department, issued guidelines in 1979 for state courts in Indian child custody proceedings that were "not intended to have binding legislative effect." 44 Fed. Reg. at 67,584. The BIA explained that, generally, "when the Department writes rules needed to carry out responsibilities Congress has explicitly imposed on the Department, those rules are binding." *Id.* However, when "the Department writes rules or guidelines advising some other agency how it should carry out responsibilities explicitly assigned to it by Congress, those rules or guidelines are not, by themselves, binding." *Id.* With respect to ICWA, the BIA concluded in 1979 that it was "not necessary" to issue binding regulations advising states how to carry out the responsibilities Congress assigned to them; state courts were "fully capable" of implementing the responsibilities Congress imposed on them, and nothing in the language or legislative history of 25 U.S.C. § 1952 indicated that Congress intended the BIA to exercise supervisory control over states. *Id.* However, in 2016, the BIA changed course and issued the Final Rule, which sets binding standards for state courts in Indian child-custody proceedings. *See* 25 C.F.R. §§ 23.101, 23.106; 81 Fed. Reg. at 38,779, 38,785. The BIA explained that its earlier, nonbinding guidelines were "insufficient to fully implement Congress's goal of nationwide protections for Indian children, parents, and Tribes." 81 Fed. Reg. at 38,782. Without the Final Rule, the BIA stated, state-specific determinations about how to implement ICWA would continue "with potentially devastating consequences" for those Congress intended ICWA to protect. *See id.*

In reviewing "an agency's construction of the statute which it administers," we are "confronted with two questions." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). First, we must examine whether the statute is ambiguous. *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress." *Id.* But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–43. We must uphold an agency's reasonable interpretation of an ambiguous statute. *Id.* at 844.

Under *Chevron* step one, the question is whether Congress unambiguously intended to grant the Department authority to promulgate binding rules and regulations. ICWA provides that "the Secretary shall promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter." 25 U.S.C. § 1952. The provision's plain language confers broad authority on the Department to promulgate rules and regulations it deems necessary to carry out ICWA. This language can be construed to grant the authority to issue binding rules and regulations; however, because "Congress has not directly addressed the precise question at issue," we conclude that section 1952 is ambiguous. *See Chevron*, 467 U.S. at 843.

Moving to the second *Chevron* step, we must determine whether the BIA's current interpretation of its authority to issue binding regulations pursuant to section 1952 is reasonable. *See* 467 U.S. at 843–44. Defendants argue that section 1952's language is substantively identical to other statutes conferring broad delegations of rulemaking authority. Indeed, the Supreme Court has held that "[w]here the empowering provision of a statute states simply that the agency may make . . . such rules and regulations as may be necessary to carry out the provisions of this Act . . . the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369 (1973) (internal quotation marks omitted); *see also City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 306 (2013) (noting a lack of

"case[s] in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field"). Here, section 1952's text is substantially similar to the language in *Mourning*, and the Final Rule's binding standards for Indian child custody proceedings are reasonably related to ICWA's purpose of establishing minimum federal standards in child custody proceedings involving Indian children. *See* 25 U.S.C. § 1902. Thus, the Final Rule is a reasonable exercise of the broad authority granted to the BIA by Congress in ICWA section 1952.

Plaintiffs contend that the BIA reversed its position on the scope of its authority to issue binding regulations after thirty-seven years and without explanation and its interpretation was therefore not entitled to deference. We disagree. "The mere fact that an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion. But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (internal citations and quotation marks omitted). The agency must provide "reasoned explanation" for its new policy, though "it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

The BIA directly addressed its reasons for departing from its earlier interpretation that it had no authority to promulgate binding regulations,

explaining that, under Supreme Court precedent, the text of section 1952 conferred "a broad and general grant of rulemaking authority." 81 Fed. Reg. at 38,785 (collecting Supreme Court cases). The BIA further discussed why it now considered binding regulations necessary to implement ICWA: In 1979, the BIA "had neither the benefit of the *Holyfield* Court's carefully reasoned decision nor the opportunity to observe how a lack of uniformity in the interpretation of ICWA by State courts could undermine the statute's underlying purposes." 81 Fed. Reg. at 38,787 (citing *Holyfield*, 490 U.S. at 30).

In *Holyfield*, the Supreme Court considered the meaning of the term "domicile," which ICWA section 1911 left undefined and the BIA left open to state interpretation under its 1979 Guidelines. 490 U.S. at 43, 51. The Court held that "it is most improbable that Congress would have intended to leave the scope of the statute's key jurisdictional provision subject to definition by state courts as a matter of state law," given that "Congress was concerned with the rights of Indian families vis-à-vis state authorities" and considered "States and their courts as partly responsible for the problem it intended to correct" through ICWA. *Id.* at 45. Because Congress intended for ICWA to address a nationwide problem, the Court determined that the lack of nationwide uniformity resulting from varied state-law definitions of this term frustrated Congress's intent. *Id.* The *Holyfield* Court's reasoning applies here. Congress's concern with safeguarding the rights of Indian families and communities was not limited to section 1911 and extended to all provisions of ICWA, including those at issue here. Thus, as the BIA explained, all provisions of ICWA that it left open to state interpretation in 1979, including many that Plaintiffs now challenge, were subject to the lack of uniformity the Supreme Court identified in *Holyfield* and determined was contrary to Congress's intent. 81 Fed. Reg. at 38,782. Thus, in light of *Holyfield*, the BIA has provided a "reasoned explanation" for departing from its earlier interpretation of its

authority under section 1952 and for the need of binding regulations with respect to ICWA. *See Fox Television Stations*, 556 U.S. at 515.

In addition to assessing whether an agency's interpretation of a statute is reasonable under *Chevron*, the APA requires that we "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Contrary to Plaintiffs' contentions, the BIA explained that the Final Rule resulted from years of study and public outreach and participation. *See* 81 Fed. Reg. 38,778, 38,784–85. In promulgating the rule, the BIA relied on its own expertise in Indian affairs, its experience in administering ICWA and other Indian child-welfare programs, state interpretations and best practices,[20] public hearings, and tribal consultations. *See id.* Thus, the BIA's current interpretation is not "arbitrary, capricious, [or] an abuse of discretion" because it was not sudden and unexplained. *See Smiley*, 517 U.S. at 742; 5 U.S.C. § 706(a)(2). The district court's contrary conclusion was error.

## C. The BIA's Construction of ICWA Section 1915

ICWA section 1915 sets forth three preferences for the placement of Indian children unless good cause can be shown to depart from them. 25 U.S.C. § 1915(a)–(b). The 1979 Guidelines initially advised that the term "good cause" in ICWA section 1915 "was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." 44 Fed. Reg. 67,584. However, section 23.132(b) of the Final Rule specifies that "[t]he party seeking departure from [section 1915's] placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences." 25 C.F.R.

---

[20] Since ICWA's enactment in 1978, several states have incorporated the statute's requirements into their own laws or have enacted detailed procedures for their state agencies to collaborate with tribes in child custody proceedings.

§ 23.132(b). The district court determined that Congress unambiguously intended the ordinary preponderance-of-the-evidence standard to apply, and the BIA's interpretation that a higher standard applied was therefore not entitled to *Chevron* deference.

Defendants contend that the Final Rule's clear-and-convincing standard is merely suggestive and not binding. They further aver that the Final Rule's clarification of the meaning of "good cause" and imposition of a clear-and-convincing-evidence standard are entitled to *Chevron* deference. Plaintiffs respond that state courts have interpreted the clear-and-convincing standard as more than just suggestive in practice, and the Final Rule's fixed definition of "good cause" is contrary to ICWA's intent to provide state courts with flexibility.

Though provisions of the Final Rule are generally binding on states, the BIA indicated that it did not intend for section 23.132(b) to establish a binding standard. *See* 25 C.F.R. § 23.132 ("The party seeking departure from the placement preferences *should* bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences." (emphasis added)). The BIA explained that "[w]hile the final rule advises that the application of the clear and convincing standard 'should' be followed, it does not categorically require that outcome . . . [and] the Department declines to establish a uniform standard of proof on this issue." *See* 81 Fed. Reg. at 38,843.

The BIA's interpretation of section 1915 is also entitled to *Chevron* deference. For purposes of *Chevron* step one, the statute is silent with respect to which evidentiary standard applies. *See* 25 U.S.C. § 1915; *Chevron*, 467 U.S. at 842. The district court relied on the canon of *expressio unius est exclusio alterius* ("the expression of one is the exclusion of others") in finding that Congress unambiguously intended that a preponderance-of-the-evidence

standard was necessary to show good cause under ICWA section 1915. The court reasoned that because Congress specified a heightened evidentiary standard in other provisions of ICWA, but did not do so with respect to section 1915, Congress did not intend for the heightened clear-and-convincing-evidence standard to apply. This was error. "When interpreting statutes that govern agency action, . . . a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cty., N.C. v. E.P.A.*, 571 F.3d 20, 36 (D.C. Cir. 2009). "[T]hat Congress spoke in one place but remained silent in another . . . rarely if ever suffices for the direct answer that *Chevron* step one requires." *Id.* (cleaned up); *see also Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("Under *Chevron,* we normally withhold deference from an agency's interpretation of a statute only when Congress has directly spoken to the precise question at issue, and the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue.") (internal citations and quotation marks omitted).

Under *Chevron* step two, the BIA's current interpretation of the applicable evidentiary standard is reasonable. *See Chevron*, 467 U.S. at 844. The BIA's suggestion that the clear-and-convincing standard should apply was derived from the best practices of state courts. 81 Fed. Reg. at, 38,843. The Final Rule explains that, since ICWA's passage, "courts that have grappled with the issue have almost universally concluded that application of the clear and convincing evidence standard is required as it is most consistent with Congress's intent in ICWA to maintain Indian families and Tribes intact." *Id.* Because the BIA's current interpretation of section 1915, as set forth in Final Rule section 23.132(b), was based on its analysis of state cases and geared toward furthering Congress's intent, it is reasonable and entitled to *Chevron*

deference. Moreover, the BIA's current interpretation is nonbinding and therefore consistent with the 1979 Guidelines in allowing state courts flexibility to determine "good cause." Section 23.132(b) of the Final Rule is thus valid under the APA. *See* 5 U.S.C. § 706(a)(2).

***

For these reasons, we conclude that Plaintiffs had standing to bring all claims and that ICWA and the Final Rule are constitutional because they are based on a political classification that is rationally related to the fulfillment of Congress's unique obligation toward Indians; ICWA preempts conflicting state laws and does not violate the Tenth Amendment anticommandeering doctrine; and ICWA and the Final Rule do not violate the nondelegation doctrine. We also conclude that the Final Rule implementing the ICWA is valid because the ICWA is constitutional, the BIA did not exceed its authority when it issued the Final Rule, and the agency's interpretation of ICWA section 1915 is reasonable. Accordingly, we AFFIRM the district court's judgment that Plaintiffs had Article III standing. But we REVERSE the district court's grant of summary judgment for Plaintiffs and RENDER judgment in favor of Defendants on all claims.

PRISCILLA R. OWEN, Circuit Judge, concurring in part and dissenting in part:

I agree with much of the majority opinion. But I conclude that certain provisions of the Indian Child Welfare Act (ICWA)[1] and related regulations violate the United States Constitution because they direct state officers or agents to administer federal law. I therefore dissent, in part.

The offending statutes include part of 25 U.S.C. § 1912(d) (requiring a State seeking to effect foster care placement of an Indian child to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have proved unsuccessful"), § 1912(e) (prohibiting foster care placement unless a State presents evidence from "qualified expert witnesses . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child"), and § 1915(e) (requiring that "[a] record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section" and that "[s]uch record[s] shall be made available at any time upon the request of the Secretary or the Indian child's tribe"). Regulations requiring States to maintain related records also violate the Constitution.[2]

---

[1] 25 U.S.C. §§ 1901 et seq.
[2] *See* 25 C.F.R. § 23.141:

> (a) The State must maintain a record of every voluntary or involuntary foster-care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or the Secretary.

The Supreme Court has made clear that Congress cannot commandeer a State or its officers or agencies: "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."[3] "The anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."[4] "The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms."[5] The Supreme Court has recognized that "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority."[6]

The defendants in the present case contend that the Indian Commerce Clause[7] empowers Congress to direct the States as it has done in the ICWA.

---

(b) The record must contain, at a minimum, the petition or complaint, all substantive orders entered in the child-custody proceeding, the complete record of the placement determination (including, but not limited to, the findings in the court record and the social worker's statement), and, if the placement departs from the placement preferences, detailed documentation of the efforts to comply with the placement preferences.

(c) A State agency or agencies may be designated to be the repository for this information. The State court or agency should notify the BIA whether these records are maintained within the court system or by a State agency.

[3] *Printz v. United States*, 521 U.S. 898, 925 (1997).
[4] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018).
[5] *Id.* at 1476.
[6] *Id.*
[7] U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.").

They are mistaken. "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents."[8]

The panel's majority opinion concludes that the ICWA does "not commandeer state agencies"[9] because it "evenhandedly regulate[s] an activity in which both States and private actors engage."[10] This is incorrect with respect to the part of 25 U.S.C. § 1912(d) addressed to foster care placement, § 1912(e), § 1915(e), and 25 C.F.R. § 23.141.

Though § 1912(d) nominally applies to "[a]ny party seeking to effect a foster care placement of . . . an Indian child under State law,"[11] as a practical matter, it applies only to state officers or agents. Foster care placement is not undertaken by private individuals or private actors. That is a responsibility that falls upon state officers or agencies. Those officers or agencies are required by § 1912(d) to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[12] That directive means that a State cannot place an Indian child in foster care, regardless of the exigencies of the circumstances, unless it first provides the federally specified services and programs without success. Theoretically, a State could decline to protect Indian children in need of foster care. It could, theoretically, allow Indian children to remain in abusive or even potentially lethal circumstances. But that is not a realistic choice, even if state

---

[8] *Murphy*, 138 S. Ct. at 1477 (quoting *New York v. United States*, 505 U.S. 144, 178 (1992)).

[9] *Brackeen v. Bernhardt*, __ F.3d __, __, 2019 WL 3759491, at *14 (5th Cir. 2019).

[10] *Id*. (quoting *Murphy*, 138 S. Ct. at 1478).

[11] 25 U.S.C. § 1912(d).

[12] *Id*.

law did not apply across the board and include all children, regardless of their Indian heritage.

Certain of the ICWA's provisions are a transparent attempt to foist onto the States the obligation to execute a federal program and to bear the attendant costs. Though the requirements in § 1912(d) are not as direct as those at issue in *Printz v. United States*,[13] the federal imperatives improperly commandeer state officers or agents:

> It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. *See Texas v. White*, 7 Wall. [700,] 725 [(1868)]. It is no more compatible with this independence and autonomy that their officers be "dragooned" (as Judge Fernandez put it in his dissent below, [*Mack v. United States*], 66 F.3d[ 1025,] 1035 [(9th Cir. 1995)]) into administering federal law, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state laws.[14]

Similarly, § 1912(e) provides that "[n]o foster care placement may be ordered" unless there is "qualified expert witness[]" testimony "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[15] This places the burden on a State, not a court, to present expert witness testimony in order to effectuate foster care for Indian children. If the federal government has concluded that such testimony is necessary in every case involving an Indian child's foster care placement, then the federal government should provide it. It cannot require the States to do so.

---

[13] 521 U.S. 898 (1997).

[14] *Id.* at 928.

[15] 25 U.S.C. § 1912(e).

The requirements in 25 U.S.C. § 1912(d) apply to termination of parental rights, not just foster care placement.[16] The laws of Indiana, Louisiana, and Texas each permit certain individuals to petition for the termination of parental rights in some circumstances,[17] and § 1912(d) applies to all parties seeking termination, not just state actors.[18] At least superficially, § 1912(d) appears to be an evenhanded regulation of an activity in which both States and private actors engage.[19] But it is far from clear based on the present record that § 1912(d) applies in a meaningful way to private actors and if so, how many private actors, as compared to state actors, have actually met its requirements. Additionally, it appears that the State plaintiffs contend that "the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of state governments."[20] I would remand for further factual development. It may be that in the vast majority of *involuntary* parental termination proceedings, the party seeking the termination is a state official or agency. It also seems highly unlikely that individuals or private actors seeking termination of parental rights (if and when permitted to do so under a State's laws) will have been in a position "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[21] It seems much more likely that these requirements fall, de facto, on the shoulders of state actors and agencies.

---

[16] *Id.* § 1912(d).

[17] *See*, *e.g.*, IND. CODE §§ 31-35-2-4, 31-35-3.5-3 (2018); IND. CODE § 31-35-3-4 (2013); LA. CHILD. CODE ANN. art. 1122 (2019); TEX. FAM. CODE ANN. § 102.005 (West 2019); TEX. FAM. CODE ANN. § 161.005 (West Supp. 2019).

[18] 25 U.S.C. § 1912(d).

[19] *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018) ("The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.").

[20] *Printz v. United States*, 521 U.S. 898, 932 (1997).

[21] 25 U.S.C. § 1912(d).

The records-keeping requirements in 25 U.S.C. § 1915(e) and 25 C.F.R. § 23.141 are direct orders to the States.[22] They do not apply to private parties in parental termination or foster care placement proceedings. They do not apply "evenhandedly [to] an activity in which both States and private actors engage."[23]

The Supreme Court expressly left open in *Printz* whether federal laws "which require only the provision of information to the Federal Government" are an unconstitutional commandeering of a State or its officers or agents.[24] But the principles set forth in *Printz* lead to the conclusion that Congress is without authority to order the States to provide the information required by § 1915(e) and related regulations. Even were the burden on the States of creating, maintaining, and supplying the required information "minimal and only temporary," the Supreme Court has reasoned that "where . . . it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a 'balancing' analysis is inappropriate."[25] The Supreme Court stressed, "It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."[26]

---

[22] *Id.* at § 1915(e) ("A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made . . . ."); 25 C.F.R. § 23.141 ("The State must maintain a record of every voluntary or involuntary foster-care, preadoptive, and adoptive placement of an Indian child . . . .").

[23] *Brackeen v. Bernhardt*, __ F.3d __, __, 2019 WL 3759491, at *14 (5th Cir. 2019) (quoting *Murphy*, 138 S. Ct. at 1478).

[24] 521 U.S. at 918.

[25] *Id.* at 932.

[26] *Id.*

The panel's majority opinion concludes that the requirements of 25 U.S.C. § 1915(e) and 25 C.F.R. § 23.141 do not commandeer state officers or agents because they "regulate state activity and do not require states to enact any laws or regulations, or to assist in the enforcement of federal statutes regulating private individuals."[27]  But the statute orders States to maintain records of each placement of an Indian child and requires those records to "evidenc[e] the efforts to comply with the order of preference specified in this section."[28]  That directs States to assist in the enforcement of the ICWA by requiring States to document efforts to comply with the ICWA's preferences. The panel's majority opinion also cites three Supreme Court decisions, none of which supports its holding regarding the creation and maintenance of records.[29]  The statute at issue in *Condon* prohibited States from disclosing or selling personal information they obtained from drivers in the course of licensing drivers and vehicles, unless the driver consented to the disclosure or sale of that information.[30]  The Court's decision in *Condon* focused on that prohibition rather than the statute's additional requirement that certain information be disclosed to carry out the purposes of federal statutes including the Clean Air Act and the Anti Car Theft Act of 1992.[31]  The *Baker* decision did not concern a requirement that States create and maintain records.[32]  The federal statute at issue in *Baker* allowed a tax exemption for registered, but not bearer, bonds, and the statute "cover[ed] not only state bonds but also

---

[27] *Brackeen*, __ F.3d at __, 2019 WL 3759491, at *14.

[28] 25 U.S.C. § 1915(e).

[29] *Brackeen*, __ F.3d at __, 2019 WL 3759491, at *14 (citing *Reno v. Condon*, 528 U.S. 141, 151 (2000); *Printz*, 521 U.S. at 918; *South Carolina v. Baker*, 485 U.S. 505, 514 (1988)).

[30] *Condon*, 528 U.S. at 143-44 (citing the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2725).

[31] *Id.* at 145, 148-51.

[32] *See Baker*, 485 U.S. at 508-10.

bonds issued by the United States and private corporations."[33]   As already discussed above, the *Printz* decision expressly left open the question of whether federal statutes requiring States to provide information was constitutional,[34] but the rationale of *Printz* compels the conclusion that some of the ICWA's commandments result in a commandeering of state officers and agents.

I agree with the panel's majority opinion that in some respects, the ICWA "merely require[s] states to 'take administrative . . . action to comply with federal standards regulating' child custody proceedings involving Indian children, which is permissible under the Tenth Amendment."[35]   Unlike the congressional enactment at issue in *Murphy*, the ICWA does "confer . . . federal rights on private actors interested in"[36] foster care placement, the termination of parental rights to an Indian child, and adoption of Indian children.  States cannot override or ignore those private actors' federal rights by failing to give notice to interested or affected parties or by failing to follow the placement preferences expressed in the ICWA.  If a State desires to place an Indian child with an individual or individuals other than the child's birth parents, the State must respect the federal rights of those upon whom the ICWA confers an interest in the placement of the Indian child or Indian children more generally. But 25 U.S.C. § 1912(d) (to the extent it concerns foster care placement), § 1912(e), § 1915(e), and 25 C.F.R. § 23.141, require more than the accommodation of private actors' federal rights regarding the placement of Indian children.  Those statutes and regulations commandeer state officers or agents by requiring them "to provide remedial services and rehabilitative

---

[33] *Id.* at 510.

[34] *Printz*, 521 U.S. at 918.

[35] *Brackeen*, __ F.3d at __, 2019 WL 3759491, at *14 (quoting *Baker*, 485 U.S. at 515).

[36] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1467 (2018).

programs designed to prevent the breakup of the Indian family" and to demonstrate that such "efforts have proved unsuccessful";[37] to present "qualified expert witnesses" to demonstrate "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child";[38] and to create and maintain records of every placement of an Indian child as well as records "evidencing the efforts to comply with the order of preference specified in this section."[39]

That these statutes and regulations "serve[] very important purposes" and that they are "most efficiently administered" at the state level is of no moment in a commandeering analysis.[40] As JUSTICE O-CONNOR, writing for the Court in *New York v. United States*, so eloquently expressed, "the Constitution protects us from our own best intentions:  It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."[41]

---

[37] 25 U.S.C. § 1912(d).

[38] *Id.* § 1912(e).

[39] *Id.* § 1915(e).

[40] *Printz v. United States*, 521 U.S. 898, 931-32 (1997).

[41] 505 U.S. 144, 187 (1992).