Filed 4/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re AUSTIN J. et al., Persons Coming Under the Juvenile Court Law. | B299564 (Los Angeles County Super. Ct. No. 19LJJP00303) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ERICA G., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Affirmed.

Neale Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

Erica G. (Mother) appeals from juvenile court jurisdictional and dispositional orders concerning seven of her children. Leslie J. (Leslie) is the presumed father of the four older children (ages 8 to 10 years old); Edward G. (Edward) is the presumed father of the three younger children (ages 2 to 4 years old).[1]

Mother contends: (1) The juvenile court lacked jurisdiction over the subject matter of this action under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.); and (2) If the court had subject matter jurisdiction, the dispositional orders must be reversed because the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court failed to comply with duties under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. We reject these arguments and affirm the juvenile court's orders.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

In March 2016, Leslie's children were living with him when a San Bernardino County juvenile court declared them dependents of the court and removed them from Leslie. In October 2016, the

---

[1] For ease of reference, we will refer to the four older children as Leslie's children and the three younger children as Edward's children. We intend no disrespect to Mother, who is the mother of all seven children.

Mother also has at least two other children, who are living with other relatives and not subjects of the underlying dependency proceedings.

[2] Mother raises no challenges regarding the merits of the juvenile court's orders. We recite only those facts necessary for a full discussion of the issues before us.

court returned the children to Mother and dismissed the dependency petition.

In November 2016, Mother allegedly left Leslie's children with Edward's parents in Robeson County, North Carolina. In December 2016, the Robeson County Department of Social Services (DSS) detained Leslie's children from Mother and placed them in foster care.

On May 31, 2017, a North Carolina juvenile court declared Leslie's children to be dependents under North Carolina law, placed them in the custody of the Robeson County DSS for placement in foster care, and approved a plan of reunification with Mother. After Mother and Edward completed classes, the children were returned to Mother.

In May 2018, Bladen County, North Carolina DSS opened a new investigation involving Mother. A social worker from Bladen County requested that the Robeson County DSS complete a home visit at a certain location and, if the family is there, "to initiate the case." (Underlining omitted.) A North Carolina social worker later told a DCFS social worker that they had "lost contact with the family due to relocating to California."

In October 2018, Mother moved to a home in Palmdale, California and enrolled in a domestic violence education group in Lancaster.

In February 2019, DCFS began an investigation concerning the family based on a referral alleging general neglect of one of Mother's children. In early May 2019, social workers determined that the children were "at risk of suffering emotional or physical harm."

On May 7, 2019, DCFS filed a petition alleging dependency jurisdiction under Welfare and Institutions Code section 300[3] over the seven children who lived with Mother. Attached to the petition are declarations by a social worker on California Judicial Council form ICWA-010(A) (Jan. 1, 2008), stating as to each child, that an "Indian child inquiry [was] made." On each form, the social worker marked a checkbox next to the statement, "[t]he child has no known Indian ancestry," and left unmarked the checkboxes for the following statements: "The child is or may be a member of or eligible for membership in a tribe"; "[t]he child's parents, grandparents, or great-grandparents are or were members of a tribe"; [t]he residence or domicile of the child, child's parents, or Indian custodian is in a predominantly Indian community"; [t]he child or child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government"; "[t]he child may have Indian ancestry"; and "[o]ther reason to know the child may be an Indian child."

At a detention hearing held on May 7, 2019, Mother and Edward were present and Leslie was not. The court detained the seven children from Mother and ordered Leslie's children placed in DCFS's custody. The court released Edward's children to him under DCFS supervision.

At the continued detention hearing held the next day, Edward did not appear, and the court detained his children from him, as well as from Mother. The court asked Mother if she had "any Native American Indian ancestry." She responded, "I was told that my mother had Cherokee," and said her "family in Little Rock,

---

[3] Unless otherwise indicated, further statutory references are to the Welfare and Institutions Code.

4

Arkansas" would have more information. The court ordered DCFS "to investigate Mother's possible ICWA connection and to notify the appropriate Cherokee nation and the appropriate federal agencies."

On the same day, Mother filed a parental notification of Indian status (California Judicial Council form ICWA-020 (Jan. 1, 2008)) stating that the child "may have Indian ancestry"; namely, Cherokee, through her grandmother, who is deceased. The form provided checkboxes to indicate: "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe"; "[t]he child is or may be a member of, or eligible for membership in, a federally recognized Indian tribe"; and "[o]ne or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized [Indian] tribe." Mother left the checkboxes blank.

Two days after the detention hearing, a social worker called Mother. Mother told the social worker that "she may have [a] connection to the Cherokee or other tribes as well as having Creole heritage." She said that "she did not know if she was registered with any tribe." The possible Cherokee heritage was on her mother's side of the family through her maternal grandmother and maternal grandfather. Mother told the social worker that her maternal aunt might have additional information.

The social worker spoke with Mother's maternal aunt by telephone the same day. The maternal aunt reported that her mother (i.e., Mother's maternal grandmother) "may have had Cherokee heritage," and she was not aware of other possible tribal heritage. She said that Mother's maternal grandfather "possibly had heritage but that she did not know what tribe." She did not know if anyone in the family had attended an Indian school, lived on a reservation or been treated at an Indian clinic.

5

In a jurisdiction / disposition report filed on May 29, 2019, DCFS reported that ICWA "does or may apply," and that the court "was informed that there may be some Cherokee Native American/Indian heritage in [Mother's] background. [DCFS] was ordered to investigate said claim." The report included the social worker's reports of her conversations with Mother and Mother's maternal aunt regarding Indian heritage.

At a jurisdiction hearing on May 30, 2019, Leslie appeared in court for the first time. The court asked him if he had "any Native American ancestry." He said he did not. The court then stated that it "finds that ICWA does not apply to [Leslie]." On the same day, Leslie filed a parental notification of Indian status (California Judicial Council form ICWA-020 (Jan. 1, 2008)), stating: "I have no Indian ancestry as far as I know." He also left unmarked other checkboxes on the form that would, if marked, indicate that he or his children are members of, or eligible for membership in, an Indian tribe. The court did not make any further inquiries or findings concerning ICWA.

In its minute order issued after the May 30 hearing, the court stated that, as to each of Leslie's children, the court "does not have a reason to know that this is an Indian child, as defined under ICWA, and does not order notice to any tribe or the [Bureau of Indian Affairs (BIA)]. Parents are to keep [DCFS], their [a]ttorney and the [c]ourt aware of any new information relating to possible ICWA status." The court did not make a similar finding or order as to Edward's children.

Edward appeared for a detention hearing on July 2, 2019. It does not appear from our record that the court asked him about Indian tribal membership or eligibility, or that the court ever made

any ICWA finding as to him or his children. Nor does our record indicate that Edward filed a parental notification of Indian status.

On July 23, 2019, DCFS filed a first amended petition concerning Leslie's children. The next day, DCFS filed a second amended petition concerning Edward's children. California Judicial Council forms ICWA-010(A) are attached to these petitions and signed by a social worker, but are otherwise unmarked. The court sustained the petitions and declared the seven children to be dependents under section 300, subdivisions (a) and (b)(1). The court then removed the children from the parents and placed them in DCFS's custody with directions to place them in foster care.

Mother filed a timely notice of appeal.

After appellate briefing was completed, Mother requested judicial notice of juvenile court minute orders concerning the seven children.[4] The minute orders indicate that, at a review hearing held on January 22, 2020, the juvenile court ordered that Leslie's children be placed with Mother and that Edward's children be placed with him and Mother. We granted Mother's unopposed request.

---

[4] "[D]ependency counsel have a duty to bring to the appellate court's attention postappellate rulings by the juvenile court that affect whether the appellate court can or should proceed to the merits." (*In re N.S.* (2016) 245 Cal.App.4th 53, 57.) Although the rulings are outside the record on appeal, we may consider the orders " 'to expedite just and final resolution for the benefit of the children involved.' " (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1412.)

## DISCUSSION

### A. *Subject Matter Jurisdiction Under the UCCJEA*

Mother contends the juvenile court lacked subject matter jurisdiction over the case under the UCCJEA because North Carolina had continuing exclusive jurisdiction over the children and any issues regarding their custody and care. We disagree.

The UCCJEA "specifies the circumstances in which California courts have jurisdiction to make an 'initial child custody determination.' " (*In re C.W.* (2019) 33 Cal.App.5th 835, 860.) Under the UCCJEA, "a court of this state has jurisdiction to make an initial child custody determination" if, among other grounds, "[t]his state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding." (Fam. Code, § 3421, subd. (a)(1).) A child's "home state" is "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).)

Here, Mother had been living in California since at least October 2018, and she does not dispute that her children lived with her in California for at least six consecutive months before DCFS filed its petition on May 7, 2019. California is thus the children's home state for purposes of the UCCJEA and California courts have jurisdiction to make an initial child custody determination. (Fam. Code, § 3421, subd. (a)(1).)

Mother argues, however, that "North Carolina seemingly had exclusive continuing jurisdiction under the UCCJEA," and "the record makes evident there were open dependency cases in North Carolina concerning the four oldest boys." Even if we assume

8

that a prior North Carolina dependency case could preclude the California court from exercising jurisdiction over the children, the record does not support Mother's argument.

In April 2019, during DCFS's investigation regarding the children, Edward informed a social worker about the North Carolina dependency proceedings and reported that "he and the mother completed classes to regain custody." The DCFS social worker contacted a North Carolina social worker who provided the case history for the children. Based upon this contact and history, the DCFS social worker included in her report to the juvenile court that the "children were returned to the mother with counseling services in place for the children." The North Carolina social worker also informed the DCFS social worker that Mother was subsequently "involved in a new investigation" in May 2018 that could have led to the "initiat[ion]" of a case. The North Carolina agency, however, lost contact with Mother after she moved to California. This evidence demonstrates that there was no pending dependency case in North Carolina when the California case began. Rather, North Carolina authorities had returned the children to Mother, contemplated initiating a new investigation and a new case, but ultimately never did so because Mother and children relocated to California.

Mother relies on Family Code section 3423. That section generally prohibits a California court from modifying child custody orders made by a court of a different state. (Fam. Code, § 3423.) It does not, however, preclude a California court from exercising jurisdiction over a child merely because a different state court has previously made orders regarding the same child. DCFS did not request, and the juvenile court did not make, any modification

of an order made by the North Carolina court. Section 3423, therefore, is inapposite.

Based on the record before us, we conclude the juvenile court had subject matter jurisdiction under the UCCJEA when DCFS filed its petition.

## B. *Indian Child Welfare Act*

Mother contends that DCFS and the court did not comply with their duties of inquiry and notice under ICWA. We conclude that the duties under ICWA were not met with respect to Edward's side of the family, but were met with respect to Mother's and Leslie's side of the family.[5]

---

[5] Although the court and DCFS failed to satisfy their duties of inquiry as to Edward, the relief that ICWA could provide in this case—invalidation of the foster care placement order (25 U.S.C. § 1914; § 224, subd. (b))—is no longer available because the court has terminated its foster care placement order and returned the children to Mother's and Edward's custody. The question whether to reverse the prior order based on noncompliance with ICWA is therefore moot. (Cf. *In re Dani R.* (2001) 89 Cal.App.4th 402, 406 [appeal from order denying mother reunification services rendered moot by post-appeal order granting her such services].) We nevertheless address the merits of the claims because the underlying dependency case and ICWA's duty of inquiry are ongoing and there is a reasonable probability that issues concerning ICWA compliance will arise again. (See *Center for Local Government Accountability v. City of San Diego* (2016) 247 Cal.App.4th 1146, 1157 [court may address merits of an issue that is otherwise moot if "there is a reasonable expectation the allegedly wrongful conduct will be repeated"].)

10

## 1. *Background*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8; *In re W.B.* (2012) 55 Cal.4th 30, 47; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1163 [ICWA does not apply to emergency removal and placement of children].) When ICWA applies, a state court may not, for example, make a foster care placement of an Indian child or terminate parental rights to an Indian child unless the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); § 361.7, subd. (a); see *In re K.B.* (2009) 173 Cal.App.4th 1275, 1288 ["Active efforts required by ICWA are 'timely and affirmative steps . . . to remedy problems which might lead to severance of the parent-child relationship.' "].) Prior to placing an Indian child in foster care, the court must also make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e); § 361.7, subd. (c).)

If an Indian child is removed from a foster care home, a subsequent placement must be in accordance with ICWA, unless the child is returned to the parent. (25 U.S.C. § 1916(b); § 224, subd. (b).) The Indian child, the parent, and the Indian child's tribe have the right to intervene in any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child"

11

(25 U.S.C. § 1911(c)), and can petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; § 224, subd. (e)).

Central to the protections ICWA provides is the determination that an Indian child is involved. For purposes of ICWA, an "Indian child" is an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions]; *In re Michael V.* (2016) 3 Cal.App.5th 225, 231-232.) Being an "Indian child" is thus not necessarily determined by the child's race, ancestry, or "blood quantum," but depends rather "on the child's political affiliation with a federally recognized Indian Tribe." (81 Fed.Reg. 38801–38802; see also *In re B.R.* (2009) 176 Cal.App.4th 773, 783 ["ICWA focuses on 'membership' rather than racial origins"].)

ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. (*In re H.B.* (2008) 161 Cal.App.4th 115, 120.) Federal regulations implementing ICWA, however, require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a).) The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Ibid.*)

ICWA provides that states may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA. (25 U.S.C.

12

§ 1921.)  Under California law, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child."  (§ 224.2, subd. (a); see *In re Isaiah W., supra,* 1 Cal.5th at p. 9; Cal. Rules of Court, rule 5.481(a).)  The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  The juvenile court must ask the participants in a dependency proceeding upon each party's first appearance "whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent . . . to complete Parental Notification of Indian Status ([California Judicial Council] form ICWA-020)."  (Cal. Rules of Court, rule 5.481(a)(2)(C), italics omitted.)

California law also requires "further inquiry regarding the possible Indian status of the child" when "the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding."  (§ 224.2, subd. (e).)  The Legislature, which added the "reason to believe" threshold for making a further inquiry in 2018, did not define the phrase.  When that threshold is reached, the requisite "further inquiry" "includes:  (1) interviewing the parents and extended family members; (2) contacting the BIA and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a

13

tribe." (*In re D.S.* (Mar. 18, 2020, D076517) __ Cal.App.5th __ [2020 WL 1430104 at *3] (*D.S.*) (fns. omitted), citing § 224.2, subd. (e)(3).)

In addition to the inquiry that is required in every dependency case from the outset and the "further inquiry" required under California law when there is a "reason to believe" an Indian child is involved, a third step—notice to Indian tribes—is required under ICWA and California law if and when "the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a); see also § 224.3, subd. (a) [if "the court, a social worker, or probation officer knows or has reason to know . . . that an Indian child is involved" in the dependency proceeding, "notice shall be sent to the [child's] parents or legal guardian, Indian custodian, if any, and the child's tribe"]; Cal. Rules of Court, rule 5.481(b)(1).)

The duty to provide notice is narrower than the duty of inquiry. Although the duty of inquiry applies to every "child for whom a petition under Section 300, 601, or 602 may be or has been filed" (§ 224.2, subd. (a)), and the duty of further inquiry applies when there is a "reason to believe that an Indian child is involved in a proceeding" (§ 224.2, subd. (e)), the duty to provide notice to Indian tribes applies only when one knows or has a "reason to know . . . an Indian child is involved," and only "for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement." (§ 224.3, subd. (a).)

In 2018, the Legislature enacted changes to the state's ICWA-related statutes for the purpose of conforming state law to recent changes in federal ICWA regulations. (See Stats. 2018, ch. 833, pp. 5342–5402; *In re A.M.* (Mar. 5, 2020, E073805) __ Cal.App.5th __ [2020 WL 1631230] (*A.M.*); Assem. Com. on

14

Appropriations, com. on Assem. Bill No. 3176 (2017–2018 Reg. Sess.) May 23, 2018, p. 1; Sen. Com. on Judiciary, Rep. on Assem. Bill No. 3176 (2017–2018 Reg. Sess.) June 18, 2018, pp. 1—2.) The changes included a redefinition of the "reason to know" requirement that triggers the duty to give notice of the proceedings to Indian tribes. Section 224.2, subdivision (d) now provides: "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances: [¶] (1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (See also Cal. Rules of Court, rule 5.481(b).)

This definition, which is substantially identical to the definition adopted in 2016 by the BIA (25 C.F.R. § 23.107(c); 81 Fed.Reg. 38778), replaced a definition under which the court would have a "reason to know" that a "child is an Indian child" based merely upon "information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents

15

are or were a member of a tribe." (Former § 224.3, subd. (b)(1); see Stats. 2018, ch. 833, §§ 5–6, pp. 5348–5350 [repealing section 224.3 and enacting section 224.2]; see, e.g., *In re Antoinette S., supra,* 104 Cal.App.4th at pp. 1407–1408 ["suggestion of Indian ancestry" sufficient to trigger ICWA notice requirements].) Cases relying on such language are no longer controlling or persuasive on this point. (See *A.M., supra*, __ Cal.App.5th __ [2020 WL 1631230 at *10] [rejecting parent's reliance on case law predating the recent regulatory and statutory changes defining "reason to know"].)

In defining the "reason to know" standard as a reason to know that a child "*is* an Indian child," the BIA expressly denied requests for more inclusive language, such as, "is *or could be* an Indian child" or "*may be* an Indian child." (81 Fed.Reg. 38804, italics added.) In rejecting the broader phrases, the BIA pointed to concerns that such language would cause "undue delay, especially when a parent has only a vague notion of a distant [t]ribal ancestor." (*Ibid.*; see also Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020) Disposition Hearing, § 2.125[1], p. 2-419 [ICWA "does not apply to the many children involved in juvenile dependency proceedings who merely have some vague, distant, or possible Indian heritage"].) Indeed, tribal ancestry is not among the criteria for having a reason to know the child is an Indian child. (§ 224.2, subd. (d); 25 C.F.R. § 23.107(c).)

## 2. *Standards of Review*

As to each of the children, the court found that ICWA does not apply. The finding implies that notice to a tribe was not required because social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry. We review a court's ICWA findings for substantial evidence. (*In re D.S., supra,*

16

__ Cal.App.5th __ [2020 WL 1430104 at *4]; *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467.)  "We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*A.M., supra*, __ Cal.App.5th __ [2020 WL 1631230 at *5].)  Mother, as the appellant, "has the burden to show that the evidence was not sufficient to support the findings and orders." (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446.)

### 3.    *Duty to Give Notice to Indian Tribes*

Mother contends that DCFS was required to provide notice to Cherokee tribes because social workers and the court had "reason to know an Indian child [was] involved."  She does not address the revised criteria for evaluating whether the court had a reason to know a child is an Indian child (§ 224.2, subd. (d)); she simply asserts in a conclusionary manner that "notice to the Cherokee tribes [w]as required by . . . ICWA."  Our review of the record does not support her argument.

We can summarily reject four of the six statutory reason-to-know criteria.  There is no evidence that any of the children or their parents resided "on a reservation or in an Alaska Native village"; none of the children said anything about having Indian ancestry; there is no evidence that any of the children were or had been "a ward of a tribal court"; and no one informed the court that either a parent or any of the children "possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d)(2), (4), (5) & (6).)

Two of the criteria merit more discussion.  Subdivisions (d)(1) and (d)(3) of section 224.2 provide that the requisite "reason to know" exists when "[a] person having an interest in the child . . . or a member of the child's extended family informs the court that

17

the child is an Indian child," or when "[a]ny participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child."

As noted above, an "Indian child" is an unmarried individual under age 18 years, who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].) There is no evidence that anyone informed the court that any of Mother's children is a member of a federally recognized Indian tribe, eligible for such membership, or that either of their biological parents is a member of such a tribe. Nor did anyone inform the court they had discovered information indicating such facts.

Mother informed the court that she had been "told that [her] mother had Cherokee [ancestry]" and, in her parental notifications of Indian status form, stated that her children "may have [Cherokee] Indian ancestry" through her grandmother. She later told a social worker that "she may have [a] connection to the Cherokee or other tribes as well as having Creole heritage," but "she did not know if she was registered with any tribe." Mother's maternal aunt provided similar statements: Mother's maternal grandmother "may have had Cherokee heritage," and Mother's maternal grandfather "possibly had heritage but that she did not know what tribe." Both the grandmother and grandfather are deceased. At most, these statements merely suggest the possibility that the children may have Cherokee ancestry; Indian ancestry, however, is not among the statutory criteria for determining whether there is a reason to know a child is an Indian child. The

18

statements, therefore, do not constitute information that a child "is an Indian child" or information indicating that the child is an Indian child, as is now required under both California and federal law. (§ 224.2, subd. (d)(1) & (3); 25 C.F.R. § 23.107(c).) Mother has therefore failed to show that the court erred in failing to ensure that notice of the proceedings was provided in accordance with ICWA. (See *A.M.*, *supra*, __ Cal.App.5th __ [2020 WL 1631230 at *10] [information from mother that she may have Indian heritage "did not rise to the level of 'information indicating that the child[ren] [are] . . . Indian child[ren]' "].)

### 4. *Duty of Initial Inquiry with Respect to Edward's Children*

The record in this case does not reveal that the court made any explicit findings that it or DCFS satisfied their duties of inquiry under ICWA or state law with respect to Edward's children. To the extent the court's rulings imply such a finding, there is no substantial evidence to support it. Indeed, it does not appear from our record that the court or any social worker ever asked Edward any questions relevant to determining whether his children were Indian children. Nor was Edward directed to fill out a parental notification of Indian status form as required (Cal. Rules of Court, rule 5.481(a)(2)), and no such form is in our record.

### 5. *Duties of Initial and Further Inquiry with Respect to Leslie's Children*

As to each of Leslie's children, the court expressly found that ICWA does not apply. The finding implies that the duty of inquiry under California's ICWA-related law had been satisfied. There is sufficient evidence to support the court's finding.

19

Attached to the initial section 300 petition are form declarations by a social worker that, as to each child, an "Indian child inquiry" was "made," that "[t]he child has no known Indian ancestry," and—as the blank checkboxes on the forms imply—the inquiry revealed no other indicia that the children are Indian children. The court asked Mother and Leslie in open court during their first appearance whether they had any Indian ancestry. Mother said that she had been "told that [her] mother had Cherokee [ancestry]" and Leslie said he did not have any Indian ancestry. Mother filled out a parental notification of Indian status form for each child stating that she "may have Indian ancestry" through a deceased maternal grandmother. Leslie filed a similar form stating he has no knowledge of Indian ancestry. The social worker's declarations and the court's in-court inquiries provide substantial evidence that DCFS and the court satisfied their initial duties of inquiry regarding Leslie's children.

Based upon Leslie's in-court statement and his parental notification of Indian status declaration indicating that he and his children have no Indian ancestry and are neither members nor eligible for membership in an Indian tribe, there was no "reason to believe" that any of his children are Indian children based on his parentage. (§ 224.2, subd. (e).) Therefore, there was no duty to make a "further inquiry" as to his side of the family.

Whether statements by Mother and her maternal aunt established a reason to believe that her children are Indian children is a closer question. Although, as explained above, the evidence provided no reason to *know* that any of the children are Indian children under the criteria in section 224.2, subdivision (d), a *belief* that a child is an Indian child presumably requires a lesser degree of certitude or factual support than *knowing* a child

20

is an Indian child. But the duty of further inquiry still requires a legally sufficient reason for that belief. The statutorily-defined reason to know a child is an Indian child is based on a logical and reasonable relationship between a fact—such as the child's living on a reservation or having been a ward of a tribal court—and the resulting knowledge that the child is an Indian child. (§ 224.2, subd. (d).) So too must a logical and reasonable relationship connect facts with a resulting belief that a child is an Indian child for the purpose of the statute. Information about a tribal connection that "is too vague, attenuated and speculative" will not support a "reason to believe the children might be Indian children." (*In re J.D.* (2010) 189 Cal.App.4th 118, 125.)

Mother's statement that she "may have Indian ancestry" and had been "told that [her] mother had Cherokee [ancestry]," and the similar statement by Mother's aunt that she "may have had Cherokee heritage," are insufficient to support a reason to believe the children are Indian children as defined in ICWA. At most, they suggest a mere possibility of Indian ancestry. Indian ancestry, heritage, or blood quantum, however, is not the test; being an Indian child requires that the child be either a member of a tribe or a biological child of a member. (25 U.S.C. § 1903(4); § 224.1, subd. (a); *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520 ["if the child is not a tribe member, and the mother and the biological father are not tribe members, the child simply is not an Indian child"].) Being a member of a tribe depends "on the child's political affiliation with a federally recognized Indian Tribe," not the child's ancestry. (81 Fed.Reg. 38801; see also *Brackeen v. Bernhardt* (5th Cir. 2019) 937 F.3d 406, 428 ["ICWA's definition of Indian child is a political classification"], rehg. en banc granted (5th Cir. 2019) 942 F.3d 287, 289.) Consequently, "many racially

21

Indian children" do not fall within ICWA's definition of an Indian child, while others may be Indian children even though they are "without Indian blood." (*Brackeen v. Bernhardt*, *supra*, 937 F.3d at p. 428.) Indian ancestry, without more, does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member. Here, there is nothing more; indeed, Mother conspicuously did not check the boxes on her parental notification of Indian status forms that would have indicated that she or any of the children is or may be a member of, or eligible for membership in, an Indian tribe.

Even if we assume that the possibility of Indian ancestry may suggest the possibility of Indian tribal membership, that bare suggestion is insufficient by itself to establish a reason to believe a child is an Indian child. In the recent changes to California's ICWA-related law, the Legislature removed the language, "information suggesting the child is a member of a tribe or eligible for membership in a tribe," from the list of circumstances that provided one with a "reason to know" a child is an Indian child. Significantly, it did not add that language to a definition of the newly created "reason to believe" standard for further inquiry. We will not infer its incorporation into that standard.

In short, the fact disclosed through the social worker's initial inquiry regarding the possibility that the children are Indian children—that Mother may have Cherokee ancestry—is insufficient by itself to provide a reason to believe that either the children or their parents are members of, or eligible for membership in, an Indian tribe. Therefore, the statute imposed no duty to make further inquiry.

The recent decision in *A.M.*, *supra*, __ Cal.App.5th __ [2020 WL 1631230] is distinguishable. In that case, the mother indicated

22

on her parental notification of Indian status form that "she was or may be a member of, or eligible for membership in a federally recognized Indian tribe," and that "one or more of her parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe." (*Id.* at *2.)  She later told a social worker that she had tribal "affiliation" with the Blackfoot and Crow tribes and "planned to register" with the tribes.  (*Id.* at *3.) The Court of Appeal held that "the information [the mother] provided was sufficient to require further inquiry."  (*Id.* at *11.) Significantly, the mother in *A.M.* did not merely say that she had Indian *ancestry*, but that she was or may be a *member* of a tribe or eligible for such membership, and that she had at least one ancestor who was or is a *member* of a tribe.  The fact that she planned to "register" with certain tribes also implies that she was eligible for membership.  In the present case, by contrast, there is no indication that Mother or any of her ancestors was a member of, or eligible for membership, in an Indian tribe.[6]

We also reject Mother's reliance on *In re N.G.* (2018) 27 Cal.App.5th 474 (*N.G.*).  In that case, the dependent child's father told social workers that, in addition to information suggesting an ancestral tribal connection, there were " 'paternal cousins' " who were "registered members of 'the Cherokee tribe.' " (*Id.* at p. 478.)  The Court of Appeal held that such information "plainly suggested [the child] may be eligible for membership in a federally recognized Cherokee tribe, and required the social worker to " 'make further inquiry.' "  (*Id.* at p. 482.)  The information that relatives of the dependent child were *members* of a tribe, and not

---

[6] Because *A.M.* is distinguishable, we express no view as to whether it was correctly decided on its facts.

23

merely tribal ancestors, distinguishes *N.G.* from the instant case for the same reason *A.M.* is distinguishable. Moreover, the court in *N.G.* based its holding on the prior definition of a reason to know, which included "information to suggest [the child is] . . . eligible for membership in a . . . tribe." (*Ibid.*, citing former § 224.3, subd. (b)(1).) As discussed above, the Legislature has removed that definition from the statutory scheme.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

<u>CERTIFIED FOR PUBLICATION</u>.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


WEINGART, J.*

---

&#42; Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24